704 S.E.2d 71

**In The Interest Of TRACY B., A Juvenile Under The Age Of Seventeen, Appellant.**

**No. 4769.**

Court of Appeals of South Carolina.

Heard Sept. 16, 2010.

Decided Dec. 20, 2010.

Rehearing Denied Jan. 28, 2011.

52

Chief Appellate Defender for Capital Appeals Robert M. Dudek, of Columbia, and Megan S. Ehrlich, of Charleston, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

GEATHERS, J.

Tracy B. appeals his juvenile convictions for murder, unlawful possession of a handgun, and unlawful possession of a handgun by a minor. He argues that the family court erred in (1) failing to suppress an inculpatory statement he gave to police, (2) failing to find that he acted in self-defense, and (3) denying his motion for a new trial. We affirm.

## FACTS

Appellant's convictions stem from the shooting death of Larry Jenkins on August 11, 2007. At approximately 2:00 a.m. on the day of the incident, a group of young people—mostly teenagers—were sitting on the front porch of a home in North Charleston, South Carolina. The members of the group included, among others, Appellant, "Twin," Kayron, and two sisters named Ebony and Edginee.[1] Both Twin and Kayron were carrying guns. At some point during the evening, Twin handed his gun to Appellant, who was fourteen years old at the time.

A green Lincoln Town Car arrived at the house. Two of the occupants of the car got out and began speaking with Appellant and the other teenagers on the porch. The conversation was "polite." Twin gave one of the Town Car occupants a "dap," or a friendly fist bump, as he approached the porch.[2] The individuals from the car then stated that they were going to the store, and they left.

About ten to fifteen minutes later, the teenagers sitting on the front porch saw the same Town Car return, with Jenkins sitting in the back seat. As the vehicle approached, an

---

1. Ebony and Edginee both resided at the house where these events occurred.

2. "Dap" is defined in the Urban Dictionary as "[t]he knocking of fists together as a greeting, or form of respect." AARON PECKHAM, URBAN DICTIONARY 98 (2005).

individual sitting in the front passenger seat of the car fired three shots into the air. The group on the porch scattered, and some of the teenagers tripped over each other in their attempts to enter the house and avoid the gunfire. When the Town Car was approximately two houses past Ebony and Edginee's house, Appellant ran from the front porch to the front gate and fired the gun in the direction of the departing car. The single gunshot struck Jenkins in the back of his head as he sat in the back seat of the Town Car, killing him.

A few days later, while at football practice, Appellant was picked up by police and brought to the North Charleston police station for questioning. A North Charleston police detective, Greg Gomes, advised Appellant of his *Miranda*[3] rights and informed Appellant that witnesses had implicated him in Jenkins' death. Appellant denied being in the area when the shooting occurred. After further questioning, Appellant informed Detective Gomes that he wanted to speak to a lawyer. Detective Gomes stopped questioning Appellant at that time and left the interview room.

Detective Gomes later returned to the interview room to take Appellant, who was still wearing some of his football gear, to the restroom so that Appellant could change into more comfortable attire. Detective Gomes accompanied Appellant back to the interview room after Appellant changed his clothes. As Detective Gomes was leaving the interview room, Appellant asked him, "How serious is this?" Detective Gomes stated that it was really serious because someone had died. Appellant then asked to speak with his mother.

Shortly thereafter, Lieutenant Melvin Cumbee, who was serving as watch commander at the police station, brought Appellant's mother to the interview room where she spoke with Appellant for five to ten minutes. When Appellant's mother left the interview room, she advised Lieutenant Cumbee that "he wanted to talk to y'all." Lieutenant Cumbee entered the interview room and sat beside Appellant. He informed Appellant that his mother mentioned that Appellant wanted to talk to the police, and he asked Appellant if he still wanted to talk. Appellant stated that he did want to talk, and

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he asked Lieutenant Cumbee about the potential length of his jail sentence. Lieutenant Cumbee informed Appellant that he did not know how long he could be incarcerated. Lieutenant Cumbee then asked Appellant what he wanted to talk about. Appellant responded by stating that he had "shot the gun at the car" and that he "just pointed the gun and shot it." Lieutenant Cumbee asked Appellant if he had been advised of his *Miranda* rights and Appellant said yes. Lieutenant Cumbee then asked Appellant if he wanted to tell his side of the story and Appellant stated that he did. At that point, Lieutenant Cumbee exited the interview room and asked Detective Gomes to obtain a formal statement from Appellant.

Appellant subsequently gave a statement to Detective Gomes in which he admitted that "[a]fter the car passed by me I shot at the car one time." He further stated that he did so because he "thought they were shooting at me." Appellant was arrested and subsequently charged with murder, unlawful possession of a handgun, and unlawful possession of a handgun by a minor.

During a pre-trial *Jackson v. Denno*[4] hearing, defense counsel moved for the suppression of Appellant's inculpatory statement to police. Defense counsel contended that Appellant's statement was not voluntarily made, and she emphasized Appellant's age, his educational level, and the fact that Appellant never signed a form waiving his rights. Defense counsel also noted that Appellant had invoked his right to counsel prior to making his statement. After hearing testimony, the family court denied Appellant's motion, finding that Appellant knowingly waived his rights and that his statement to police was voluntarily given.

The family court held Appellant's trial in December of 2007. At the conclusion of the State's case, Appellant moved for a directed verdict, contending, among other things, that the State failed to disprove that Appellant was acting in self-defense. The family court denied Appellant's motion. Appellant renewed his motion for a directed verdict at the conclusion of his case, and the family court again denied the motion.

---

4. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

60

The family court subsequently found Appellant guilty of murder, unlawful possession of a handgun, and unlawful possession of a handgun by a minor. Appellant moved for a new trial based on "all previous motions and lack of evidence." After Appellant's motion for a new trial was denied, Appellant was committed to the Department of Juvenile Justice for an indeterminate period not to exceed his 21st birthday. This appeal followed.

## ISSUES ON APPEAL

1. Did the family court err in failing to suppress Appellant's statement to police?

2. Did the family court err in finding Appellant guilty of murder beyond a reasonable doubt when the State failed to disprove self-defense beyond a reasonable doubt?

3. Did the family court err in denying Appellant's motion for a new trial based on lack of evidence presented at trial?

## LAW/ANALYSIS

### I. Appellant's Statement

Appellant argues that the family court erred by refusing to suppress his inculpatory statement to the police. Specifically, he contends that his statement should have been suppressed because the police interrogated him after he invoked his right to counsel. He also claims that his statement to police was not voluntarily made. We proceed to address each of these arguments in turn.

### A. Invocation of Fifth Amendment Right to the Presence of an Attorney during Custodial Interrogation

 Appellant contends his statement should have been suppressed because the police interrogated him after he invoked his right to have an attorney present. We disagree.

 The Fifth Amendment's privilege against self-incrimination provides an individual who has been accused of a crime the right to consult with an attorney and to have an attorney

present during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This privilege has been extended to the States via the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("[T]he Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."). Once an accused has invoked his right to have an attorney present during custodial interrogation, he may not be subjected to further police interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

 In contrast, "[t]he Sixth Amendment right to counsel 'attaches only at or after the initiation of adversary judicial proceedings against the defendant.' " [5] *State v. Stahlnecker,* 386 S.C. 609, 620, 690 S.E.2d 565, 571 (2010) (quoting *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Stahlnecker,* 386 S.C. at 620, 690 S.E.2d at 571 (quoting *Rothgery v. Gillespie Cnty.,* 554 U.S. 191, 128 S.Ct. 2578, 2592, 171 L.Ed.2d 366 (2008)). Here, while Detective Gomes had informed Appellant that he planned to charge him, Appellant had not been formally charged or arraigned at the time he made his statement to police. In fact, the record indicates that Appellant gave his inculpatory statement to Detective Gomes less than two hours after the initial interrogation began.

In the present case, Appellant argues that he did not reinitiate communication with police after he invoked his right to an attorney, but rather that the police reinitiated contact with him. In making this argument, Appellant cites *State v. Anderson,* 357 S.C. 514, 593 S.E.2d 820 (Ct.App.2004). Initial-

---

5. The Sixth Amendment provides in pertinent part that *"[i]n all criminal prosecutions,* the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI (emphasis added).

ly, we note that the *Anderson* decision was based upon the Sixth Amendment right to formal representation by counsel rather than the Fifth Amendment right to consult an attorney during custodial interrogation that is at issue in the present case. *Id.* at 517–18, 593 S.E.2d at 822. In addition, the *Anderson* opinion hinges upon the bright-line rule set forth in *Michigan v. Jackson* that once a defendant invokes his or her Sixth Amendment right to counsel, any subsequent waiver is presumed invalid if secured pursuant to police-initiated conversation. *See Anderson*, 357 S.C. at 518–19, 593 S.E.2d at 822 (citing *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).

*Jackson* was recently overruled by *Montejo v. Louisiana*, 556 U.S. ——, 129 S.Ct. 2079, 2091, 173 L.Ed.2d 955 (2009). In *Montejo*, the Supreme Court concluded that *Jackson*'s expansion of the *Edwards* rule was not warranted in light of the "marginal benefits" and "substantial costs" of that expansion.[6] *Id.* at 2091. The *Montejo* Court remanded to permit Montejo to argue whether or not he initiated the subsequent police interrogation in accordance with *Edwards*. *Id.* at 2091. Therefore, the additional protection afforded by *Edwards* is currently applicable in both Fifth Amendment and Sixth Amendment contexts.

Accordingly, although *Anderson* was a Sixth Amendment right to counsel case, we believe the facts of *Anderson* are relevant to the question presented here (i.e., whether police violated the *Edwards* rule by reinitiating contact with Appellant). Thus, a comparison of the facts of *Anderson* with those of the present case is warranted. Anderson was arraigned for murder and completed documentation requesting the services of a public defender. *Anderson*, 357 S.C. at 518, 593 S.E.2d at 822. Later the same day, the defendant's aunt visited him at the police station. *Id.* After the visit, his aunt suggested to

---

6. *Michigan v. Jackson* set forth a bright-line rule that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, *any waiver* of the defendant's right to counsel for that police-initiated interrogation *is invalid.*" *Jackson*, 475 U.S. at 636, 106 S.Ct. 1404 (emphasis added). *Montejo v. Louisiana* overruled *Jackson*, noting the marginal benefits of a bright-line policy designed to prevent coerced confessions were "dwarfed by" the substantial societal costs of hindering the conviction and punishment of those who violate the law. *Montejo*, 129 S.Ct. at 2089.

one of the police officers investigating the crime that he "go talk to [the defendant] again." *Id.* The officer went to talk to the defendant again, read him his *Miranda* warnings, and asked him if "anything had changed since the last time [they] talked." *Id.* The defendant subsequently made a self-incriminating statement. *Id.*

We believe the facts of *Anderson* are distinguishable from the present case. In *Anderson,* the defendant's aunt merely suggested to police that they go talk to Appellant. *Id.* She did not indicate to police that the defendant himself wanted to talk to them. Here, in contrast, after speaking to Appellant, Appellant's mother informed police that "he wanted to talk to y'all." Moreover, before questioning Appellant, the police confirmed that Appellant still wanted to talk to them. Therefore, while Anderson arguably did not reinitiate contact via his aunt, we believe Appellant did reinitiate contact through his mother.

Most other jurisdictions addressing the issue have held that defendants can, after invoking their Fifth Amendment right to counsel, reinitiate contact with police via a third party. *See, e.g., Van Hook v. Anderson,* 488 F.3d 411, 428 (6th Cir.2007) (holding when police receive information from a third party which *might* evince a willingness and a desire to talk by the suspect, this is enough to justify a limited inquiry with the suspect to confirm or disaffirm that belief); *Owens v. Bowersox,* 290 F.3d 960, 962–64 (8th Cir.2002) (holding that defendant initiated contact with police where defendant's mother informed police that the defendant wanted to talk to them); *United States v. Michaud,* 268 F.3d 728, 735–38 (9th Cir.2001) (holding that defendant initiated communication with police where defendant's cellmate told police that defendant wanted to speak to someone "about a murder"); *United States v. Gaddy,* 894 F.2d 1307, 1310–11 (11th Cir.1990) (holding that "no police-initiated interrogation occurred" where police interrogated defendant after being notified by the defendant's aunt that the defendant "wished to speak"); *Ex parte Williams,* 31 So.3d 670, 683 (Ala.2009) (holding that under *Edwards* an accused can initiate further interrogation through a third party); *Harvell v. State,* 275 Ga. 129, 562 S.E.2d 180, 182 (2002) (observing that defendant initiated further contact with police through his mother).

The facts of *Harvell* are substantially similar to the present case, and warrant some discussion. In *Harvell*, the defendant's mother informed police that the defendant wished to give them a statement. *Id.* at 182. A police officer thereafter asked the defendant, who had previously requested a lawyer, if he had "changed his mind." *Id.* The defendant stated that he had. *Id.* The defendant then signed a waiver form and gave an inculpatory statement. *Id.* The statement was admitted at trial and the defendant was convicted of various offenses. *Id.* On appeal, the Georgia Supreme Court held that the *Edwards* rule was not violated by the admission of the defendant's statement. *Id.* at 182–83. It explained:

> Appellant contends that, by asking whether he had changed his mind, the officer violated the mandate of *Edwards*. However, the obvious purpose of this limited inquiry was to determine whether the information relayed by Harvell's mother was correct. By merely confirming her report that he was willing to make a statement, the officer did not reinitiate interrogation. Under these circumstances, Harvell reinitiated the questioning—albeit through his agent, his mother.

*Id.* at 182 (internal citations and quotations omitted). Other jurisdictions have also held that when the police receive information from a suspect or a third party that appears to show the suspect is willing to talk to them, they may inquire into whether the suspect was reinitiating communication. *See Van Hook,* 488 F.3d at 428; *Michaud,* 268 F.3d at 735–36.

Here, as in *Harvell*, the record demonstrates Appellant reinitiated communication with police, and not vice-versa. After meeting with Appellant, Appellant's mother informed Lieutenant Cumbee that Appellant wanted to speak with authorities. Shortly thereafter, Lieutenant Cumbee asked Appellant whether he still wanted to speak with police, and Appellant answered in the affirmative. In making this limited inquiry, Lieutenant Cumbee was not reinitiating communication with Appellant; he was merely confirming that the information he received from Appellant's mother was accurate. Appellant then asked Lieutenant Cumbee about the length of his potential jail sentence—further proof that Appellant did in fact want to talk to police about the investigation. *Cf. Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d

405 (1983) (plurality opinion) (holding that the defendant evinced a desire for a generalized discussion about the investigation by asking, "Well, what is going to happen to me now?"). After informing Appellant that he did not know how long Appellant could be incarcerated, Lieutenant Cumbee asked Appellant what he wanted to talk about—a relatively innocuous question that could prompt any number of non-incriminating responses. At that point, Appellant admitted he had fired a single shot at the car. Based upon these facts, we find Appellant reinitiated communication with police.

Furthermore, we believe this conclusion comports with the purposes of the *Edwards* rule. The United States Supreme Court has stressed "the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis." *Maryland v. Shatzer*, 559 U.S. ——, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010). As such, it is "justified only by reference to its prophylactic purpose." *Id.* (quoting *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). According to the Court, the purpose behind the *Edwards* rule is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). Stated differently, "[t]he rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures." *Minnick v. Mississippi*, 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

In the present case, we do not believe the actions taken by police can fairly be characterized as "coercive." After being told by Appellant's mother that Appellant wanted to speak to police, Lieutenant Cumbee asked Appellant if he still wanted to talk and, if so, what Appellant wanted to talk about. There is no evidence that either Lieutenant Cumbee or Detective Gomes pressured Appellant into implicating himself. Detective Gomes testified that Appellant was not "threatened in any way" when he gave his formal statement. Detective Gomes also allowed Appellant to change out of his football pants into shorts so that Appellant would be more comfortable, and gave him a protein drink when Appellant said he was hungry. Lieutenant Cumbee asked Appellant if he had been advised of his *Miranda* rights before any further questioning, and Appellant said yes. Lieutenant Cumbee testified that he did not

make any promises to Appellant to tell the family court judge about Appellant's cooperation.

Based on the foregoing, we do not believe the police's actions in this case constituted "badgering" or "coercive pressure." Accordingly, we find the *Edwards* rule does not mandate the suppression of Appellant's statement to police.

## B. Voluntariness of Appellant's Statement

█ Appellant next argues the family court erred in failing to suppress his statement to police because it was not voluntarily made. We disagree.

█ "A criminal defendant is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession." *State v. Pittman*, 373 S.C. 527, 565, 647 S.E.2d 144, 164 (2007) (citing *Jackson v. Denno*, 378 U.S. 368, 377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)). In conducting the due process analysis, "courts look to the totality of circumstances to determine whether a confession was voluntary." *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). The pertinent circumstances include "the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). No one factor is determinative; each case requires careful scrutiny of all the surrounding circumstances. *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164 (citing *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041).

█ A confession of a juvenile is not per se involuntary simply because it is obtained without the presence of counsel, a parent, or other interested adult. *See In re Williams*, 265 S.C. 295, 300, 217 S.E.2d 719, 721–22 (1975) (declining to adopt a rule in which any inculpatory statement made by a minor in the absence of counsel, parent, or other friendly adult is per se inadmissible). *But cf. Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (noting the opportunity to receive adult advice in the form of a lawyer or an adult

relative or friend would afford a juvenile additional protection and put him on "a less unequal footing with his interrogators").

■■■■■ "Although courts have given confessions by juveniles special scrutiny, courts generally do not find a juvenile's confession involuntary where there is no evidence of extended, intimidating questioning or some other form of coercion." *Pittman*, 373 S.C. at 568, 647 S.E.2d at 165. When the only evidence presented is the young age of the appellant, this alone is not probative of coercion. *See id.* at 569, 647 S.E.2d at 166; *accord Williams v. Peyton*, 404 F.2d 528, 530 (4th Cir.1968) ("Youth by itself is not a ground for holding a confession inadmissible.").

Here, upon reviewing the totality of the circumstances, we believe the family court correctly determined that Appellant's inculpatory statement was made voluntarily. First, as discussed above, the police did not act in an intimidating or coercive fashion in this case. There is no evidence that police put undue pressure on Appellant; in fact, Detective Gomes specifically testified that Appellant was not threatened in any way. Moreover, there is no evidence that Appellant was subjected to any sort of physical punishment. Rather, the record shows that the police attempted to make Appellant comfortable by allowing him to change out of his football gear and giving him a protein drink.

Second, the length of Appellant's interrogation was relatively short. Appellant was advised of his *Miranda* rights at 8:35 p.m. and he asked for an attorney forty minutes later at 9:15 p.m. Questioning then ceased. At approximately 10:15 p.m., Lieutenant Cumbee asked Detective Gomes to obtain a formal statement from Appellant. That task was completed at 10:20 p.m. Thus, only an hour and forty-five minutes elapsed between the time that Appellant's initial interrogation began and the time that he gave his statement to Detective Gomes. In addition, Appellant was not subjected to interrogation by police for about an hour of that period.

Third, Detective Gomes advised Appellant of his *Miranda* rights before he initially began questioning Appellant, and Appellant signed a form stating that he understood those rights. Detective Gomes testified that he had no reason to

believe that Appellant did not understand his rights. Al-- though Lieutenant Cumbee did not re-Mirandize Appellant when questioning recommenced, he did ask Appellant whether he had been previously advised of his *Miranda* rights, and Appellant said yes. At that time, less than two hours had transpired since Appellant was initially Mirandized.

Fourth, although Appellant was only fourteen years old at the time he made the inculpatory statement, this fact alone does not make his statement inadmissible. Rather, Appellant's age is just one factor that must be considered along with other circumstances such as "his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." *Williams,* 265 S.C. at 300, 217 S.E.2d at 722 (citations and quotations omitted). Here, it does not appear that Appellant suffered from low intelligence; the last grade he completed was eighth grade, which is typical for a fourteen-year-old. Appellant was apprised of his *Miranda* rights and was told that anything he said could be used against him in a court of law. Detective Gomes testified that Appellant did not seem to be confused or to be under the influence of any substance.

Finally, the fact that police allowed Appellant to speak to his mother provided him with additional protection and put him on a "less unequal footing" with his interrogators. *See Gallegos,* 370 U.S. at 54, 82 S.Ct. 1209. Appellant asked if he could speak to his mother, and he was given the opportunity to do so. The police were not present while Appellant spoke to his mother, and no evidence was presented to suggest the police used Appellant's mother as an agent to obtain her son's confession. *Cf. Spano v. New York,* 360 U.S. 315, 322–24, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (finding a defendant's confession involuntary when the police directed a childhood friend of the defendant to falsely tell the defendant that his job with the police department was in jeopardy if defendant did not confess, and the interrogation process continued for eight straight hours).

Accordingly, upon a review of the totality of the circumstances, we hold that Appellant's statement to police was made voluntarily.

## II. Self–Defense

Appellant argues the family court erred in finding him guilty of murder beyond a reasonable doubt when the State allegedly failed to disprove self-defense beyond a reasonable doubt. We disagree.

### A. Evidence of Murder

Murder is statutorily defined as "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (2003). " 'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998). "It is the doing of a wrongful act intentionally and without just cause or excuse." *Tate v. State*, 351 S.C. 418, 426, 570 S.E.2d 522, 527 (2002).

Malice can be inferred from conduct which is so reckless and wanton as to indicate a depravity of mind and general disregard for human life. *State v. Mouzon*, 231 S.C. 655, 662, 99 S.E.2d 672, 675 (1957). In the context of murder, malice does not require ill-will toward the individual injured, but rather it signifies "a general malignant recklessness of the lives and safety of others, or a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief." *Id.* at 662, 99 S.E.2d at 675–76 (quoting *State v. Heyward*, 197 S.C. 371, 375, 15 S.E.2d 669, 671 (1941)).

The evidence presented at trial demonstrated Appellant shot a gun in the direction of an occupied vehicle, thereby killing Victim. In his statement, Appellant admitted he saw "an arm come out the passenger window of the car and start shooting." Immediately thereafter, Appellant ran towards the vehicle in the street and fired a single shot in the direction of the vehicle. We believe this was sufficient evidence of reckless conduct and wanton disregard for human life from which the family court could infer malice. Accordingly, the family court did not err in finding the State proved Appellant guilty of murder beyond a reasonable doubt.

### B. Evidence of Self–Defense

Appellant argues the State failed to disprove self-defense beyond a reasonable doubt. We disagree.

■ In *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the United States Supreme Court held that juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with a violation of a criminal law. "Current law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt." *State v. Burkhart*, 350 S.C. 252, 261, 565 S.E.2d 298, 303 (2002) (quoting *State v. Wiggins*, 330 S.C. 538, 544, 500 S.E.2d 489, 492–93 (1998)).

■ "To establish self-defense in South Carolina, four elements must be present." *State v. Bryant*, 336 S.C. 340, 344, 520 S.E.2d 319, 321 (1999). The four elements are: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief; if the defendant was actually in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life; and (4) the defendant had no other probable means of avoiding the danger. *Id.* at 344–45, 520 S.E.2d at 321–22.

We believe the State presented sufficient evidence to disprove two of the four elements of self-defense beyond a reasonable doubt. We acknowledge that Appellant presented some evidence demonstrating he actually believed he was in imminent danger of serious bodily harm, and that a reasonably prudent person of ordinary firmness and courage would have entertained the same belief. *Bryant*, 336 S.C. at 344, 520 S.E.2d at 321. In his statement to Detective Gomes, Appellant claimed that he shot at the car because "I thought they were shooting at me." The other teenagers sitting on the front porch that night testified they were afraid as well, and Kayron admitted that he tripped over either Ebony or Edginee in his frenzied attempt to enter their home to avoid the gunfire.

However, the State presented evidence to disprove the first element of self-defense beyond a reasonable doubt. Specifically, we do not believe Appellant was without fault in bringing on the difficulty. *Bryant*, 336 S.C. at 344, 520 S.E.2d at 321. The record reflects that the initial difficulty had passed by the time Appellant chose to fire the fatal shot. According to Ebony's estimate, the Town Car had passed their house and was two houses beyond when Appellant ran out to the front gate and fired his gun. Appellant admitted in his statement to Detective Gomes that he shot at the car "[a]fter the car passed by me." In addition, the State presented evidence that Appellant was in unlawful possession of a pistol on the evening in question. Although this fact alone does not automatically bar a self-defense charge, it is evidence of an unlawful activity which can preclude the assertion of self-defense. *State v. Slater*, 373 S.C. 66, 70, 644 S.E.2d 50, 52–53 (2007).

Finally, the State disproved the fourth element of self-defense beyond a reasonable doubt. Appellant plainly had other means of avoiding the danger. *Bryant*, 336 S.C. at 345, 520 S.E.2d at 322. The other teenagers sitting on the front porch ran into the house when the first shots were fired from the Town Car. Appellant was the only teenager sitting on the front porch that evening who ran towards the departing car and fired a gun in its direction. Under these circumstances, Appellant could easily have avoided further confrontation.

Based upon the foregoing, we believe the State disproved self-defense beyond a reasonable doubt. *See Burkhart*, 350 S.C. at 261, 565 S.E.2d at 303. Specifically, the State presented evidence to disprove the first and fourth elements of self-defense. *Bryant*, 336 S.C. at 344–45, 520 S.E.2d at 321–22. The State need only disprove one of the four elements of self-defense beyond a reasonable doubt. *State v. Bixby*, 388 S.C. 528, 554, 698 S.E.2d 572, 586 (2010) ("Because all of the elements are required to establish self-defense ... [i]t is an axiomatic principle of law that [self-defense] has not been established if any one element is disproven."). Therefore, we affirm Appellant's murder conviction as the State disproved self-defense beyond a reasonable doubt.

### III. New Trial

Lastly, Appellant argues the family court erred in denying his motion for a new trial based on lack of evidence presented at trial. We disagree.

"[T]he grant or refusal of a new trial is within the discretion of the trial judge and will not be disturbed on appeal absent a clear abuse of that discretion." *State v. Smith,* 316 S.C. 53, 55, 447 S.E.2d 175, 176 (1993). "An abuse of discretion occurs when the trial court's findings are wholly unsupported by the evidence or the conclusions reached are controlled by an error of law." *Wright v. Craft,* 372 S.C. 1, 36, 640 S.E.2d 486, 505 (Ct.App.2006); *accord State v. Anderson,* 386 S.C. 120, 126, 687 S.E.2d 35, 38 (2009).

Here, the State presented evidence of malice for purposes of murder, and the State presented evidence that disproved self-defense beyond a reasonable doubt. Therefore, the family court did not abuse its discretion in denying Appellant's motion for a new trial based on lack of evidence presented at trial.

### CONCLUSION

For all of the foregoing reasons, we affirm.

FEW, C.J., and HUFF, J., concur.