# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Gregory Lamont Brooks, Appellant.

Appellate Case No. 2016-002301

Appeal From Lexington County
Eugene C. Griffith, Jr., Circuit Court Judge

Opinion No. 5693
Heard October 14, 2019 – Filed November 20, 2019

**AFFIRMED**

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Senior Assistant Deputy Attorney General William M. Blitch, Jr., and Assistant Attorney General Samuel Marion Bailey, all of Columbia; and Solicitor Samuel R. Hubbard, III, of Lexington, for Respondent.

**GEATHERS, J.:**    Appellant Gregory Lamont Brooks seeks reversal of his convictions for murder and possession of a weapon during the commission of a violent crime.  Appellant argues the circuit court erred by instructing the jury that malice may be inferred from the use of a deadly weapon because there was evidence that could have reduced the murder charge to voluntary manslaughter and, therefore, the instruction was confusing and prejudicial.  Appellant also argues the circuit court erred by excluding from evidence two photographs found on the cell phone of a bar patron present at the shooting and in communication with a suspect because the photographs, which depicted a gun, were relevant to Appellant's defense of third party guilt.  We affirm.

## FACTS/PROCEDURAL HISTORY

In the early morning hours of February 2, 2014, Fred Moss, Brandon Ratliff, and Andre Bunch visited the Cockpit Bar and Grill on Berryhill Road in Columbia.  Andre drove separately and met Fred and Brandon at the bar.  Andre had to park his car in the road because all of the spaces in the parking lot were taken.  The three friends separated after they arrived, and Fred began a conversation with a female sitting at the bar.

Two or three minutes later, Fred noticed several people on the dance floor looking at him.  A man wearing a skull cap was held back by others as he tried to approach Fred.  Fred had the impression that he must have been speaking with "somebody['s] girl."   Then a young man with dreadlocks extending past his shoulders approached Fred, "said something slick," and asked "What's up?"  Fred responded, "What's up?," and "things started escalating."  Andre observed Fred and several other people "fussing back and forth."  Andre was concerned, so he briefly talked with Fred and, separately, with Brandon, then went to close out his tab.  As Andre was paying his tab, he noticed a bouncer escorting Fred and Brandon out of the bar.  Andre walked outside approximately five minutes later.

The group of people arguing with Fred followed him and Brandon into the parking lot.[1]  Brandon went to the driver's side of Fred's car, and Fred went to the passenger's side and tried to open the door, but it was locked.  Fred then noticed the hostile group behind him.  Fred adjusted his belt in an attempt to convey the impression he was armed and to "scare them away," but he later testified that the hostile group did not see that.  Fred testified the man with the long dreadlocks and

---

[1] Andre testified that all of the bar patrons were leaving at that time because the bar was closing.

Appellant, who had shorter, shoulder-length dreadlocks, were displaying their guns, pacing back and forth, and stating, "What's up now?"  As soon as Fred saw that they were armed, Fred raised his hands to show he was unarmed.[2]  Nevertheless, Appellant unleashed a hail of gunfire toward Brandon and then Fred as Appellant paced back and forth.  Appellant then started shooting at Fred's car as he paced backwards, approaching Rickena Knightner's parked car.  Rickena, who had previously met Appellant and knew him by the nickname "Dink," testified that as he was approaching her car, she saw he had a gun and said, "[N]o, Dink, No, Dink." Appellant responded, "Get down" while gesturing with his arm for her to stay out of the way.  After Appellant stopped firing his gun, he immediately ran to, and entered, a car that had pulled up behind Rickena's car and fled the scene.

Fred began looking for Brandon and discovered him lying in the middle of the road with blood on his chest.  Andre, who had been walking to his car when he heard the gunshots, realized Fred and Brandon might be in trouble, so he jumped in his car and raced to Brandon's location.  Andre placed Brandon in the back seat of his car with Fred and rushed to Lexington Medical Center.  Tragically, Brandon bled out on the way to the hospital due to a bullet lacerating his heart.

Appellant was indicted for murder and possession of a weapon during the commission of a violent crime.  After the jury found Appellant guilty on both charges, the circuit court sentenced Appellant to thirty-five years' imprisonment for murder and five years' imprisonment for weapon possession, to be served concurrently.  This appeal followed.

## ISSUES ON APPEAL

1.   Did the circuit court err by charging the jury that malice may be inferred from the use of a deadly weapon?

2.   Was the implied malice jury charge harmless beyond a reasonable doubt?

3.   Did the circuit court abuse its discretion by excluding the two gun photographs from evidence?

---

[2] At trial, Fred testified during direct examination, "I was standing there with my hands like this (indicating.)."  On cross examination, Fred testified, "I had my hands *up* because they had the real thing. I'm over here playing[,] and they had the real thing[,] so I just *held my hands up* like that."  (emphases added).

## STANDARD OF REVIEW

An appellate court will not reverse a trial court's decision regarding a jury instruction unless there is an abuse of discretion. *State v. Cottrell*, 421 S.C. 622, 643, 809 S.E.2d 423, 435 (2017). Likewise, "[t]he admission of evidence is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Dickerson*, 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 166–67 (2007).

## LAW/ANALYSIS

### I.     Inferred Malice Instruction

Appellant argues the circuit court erred by instructing the jury that malice may be inferred from the use of a deadly weapon because there was evidence that could have reduced the murder charge to voluntary manslaughter and, therefore, the instruction was confusing and prejudicial. In support of this argument, Appellant cites *State v. Belcher*, 385 S.C. 597, 610, 685 S.E.2d 802, 809 (2009), *overruled in part by State v. Burdette*, 427 S.C. 490, 505 n.3, 832 S.E.2d 575, 583 n.3 (2019). Appellant also argues that the circuit court's error cannot be considered harmless because the instruction was given shortly after the circuit court instructed the jury to examine the surrounding circumstances to determine criminal intent. We will address these arguments in turn.

A. Merits

1.     Impact of *State v. Burdette*

In *Belcher*, our supreme court held that when evidence of self-defense or any evidence that would reduce, mitigate, excuse, or justify a homicide is presented, the circuit court may not charge the jury that malice may be inferred from the use of a deadly weapon. 385 S.C. at 610, 685 S.E.2d at 809. However, in *State v. Burdette*, our supreme court recently held in a unanimous decision, "*[R]egardless of the evidence presented at trial*, a trial court shall not instruct the jury that it may infer the existence of malice when the deed was done with a deadly weapon." 427 S.C. at 503, 832 S.E.2d at 582 (emphasis added). The court explained that this particular jury charge was an impermissible charge on the facts. *Id.* at 502–03, 832 S.E.2d at 582. The court also held that this ruling was effective in cases pending on direct

review or not yet final, as long as the issue is preserved. *Id.* at 505, 832 S.E.2d at 583. The court overruled "in part" prior case law, including *Belcher*, "insofar as it can be construed that [the court had] approved a trial court's charge that a jury may infer the existence of malice from the defendant's use of a deadly weapon." *Id.* at 505 n.3, 832 S.E.2d at 583 n.3.

In light of *Burdette*, the circuit court's inferred malice instruction in the present case clearly constitutes error. Further, this new point of law is properly before the court because the *Burdette* opinion was issued after the parties in the present case filed their final briefs, and since that time, Appellant has referenced *Burdette* as a supplemental citation pursuant to Rule 208(b)(7), SCACR. Nonetheless, we address below whether the inferred malice instruction also ran afoul of *Belcher* to the extent this issue could affect a harmless error analysis.

2.      Violation of *Belcher*

"The law to be charged must be determined from the evidence presented at trial." *State v. Childers*, 373 S.C. 367, 373, 645 S.E.2d 233, 236 (2007). Here, Appellant argues there was evidence that the shooting resulted from sudden heat of passion upon sufficient legal provocation, thus reducing the offense of murder to voluntary manslaughter. *See State v. Oates*, 421 S.C. 1, 23, 803 S.E.2d 911, 923–24 (Ct. App. 2017) (defining voluntary manslaughter as "the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation" (quoting *State v. Starnes*, 388 S.C. 590, 596, 698 S.E.2d 604, 608 (2010))). Appellant asserts the presence of this evidence in the case prohibited the circuit court from giving an inferred malice jury instruction. However, there was no evidence of sufficient legal provocation. *See State v. Byrd*, 323 S.C. 319, 322, 474 S.E.2d 430, 432 (1996) ("Both heat of passion and sufficient legal provocation must be present at the time of the killing.").

First, there is no evidence that Brandon interacted with Appellant. Further, assuming Fred's behavior could be considered in this analysis,[3] his argument with Appellant and his companions was not enough to constitute legal provocation. *See Byrd*, 323 S.C. 319, 322, 474 S.E.2d 430, 432 ("Where death is caused by the use of

---

[3] *See State v. Wharton*, 381 S.C. 209, 215, 672 S.E.2d 786, 789 (2009) ("[T]he applicability of the doctrine of transferred intent to voluntary manslaughter cases whe[n] the defendant kills an unintended victim upon sufficient legal provocation committed by a *third party* remains an unsettled question in South Carolina." (emphasis added)).

a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation.").  Moreover, even if Appellant saw Fred's subsequent act of adjusting his belt and could have interpreted this act as reaching for a weapon, Fred raised his hands before Appellant started shooting to show Appellant that he was unarmed.  *Cf. Wharton*, 381 S.C. at 214, 672 S.E.2d at 788 (finding there was no evidence of sufficient legal provocation when there was no evidence showing the victim provoked the appellant, "and although there was evidence that [the appellant] and [a third party] argued and exchanged words, there was no evidence [the third party] posed a threat to [the appellant] either by possessing a weapon or through hostile acts").  Therefore, we reject Appellant's argument that there was evidence reducing the offense from murder to voluntary manslaughter.

## B.  Harmless Error

"Most trial errors, even those [that] violate a defendant's constitutional rights, are subject to harmless-error analysis."  *State v. Rivera*, 402 S.C. 225, 246, 741 S.E.2d 694, 705 (2013).  "The Supreme Court has found 'an error to be "structural," and thus subject to automatic reversal only in a very limited class of cases.'"  *Id.* at 247, 741 S.E.2d at 705 (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)).  "When considering whether an error with respect to a jury instruction was harmless, [the appellate court] must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.'"  *Burdette*, 427 S.C. at 496, 832 S.E.2d at 578 (quoting *State v. Middleton*, 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014)).

"In making a harmless error analysis, [the appellate court's] inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered."  *Id.* (quoting *Middleton*, 407 S.C. at 317, 755 S.E.2d at 435).  "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous."  *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62 (1991).  Rather, it is "to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."  *Id.*

"Thus, whether or not the error was harmless is a fact-intensive inquiry."  *Middleton*, 407 S.C. at 317, 755 S.E.2d at 435.  The appellate court "must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict."  *State v. Kerr*, 330 S.C. 132, 145, 498 S.E.2d 212, 218 (Ct. App. 1998).  Further, "[w]hen considering whether an

incorrect jury instruction constitutes harmless error, [the appellate court is] required to review the trial court's charge to the jury in its entirety." *Burdette*, 427 S.C. at 498, 832 S.E.2d at 580 (citing *State v. Stanko*, 402 S.C. 252, 264, 741 S.E.2d 708, 714 (2013), *overruled on other grounds by Burdette*, 427 S.C. at 505 n.3, 832 S.E.2d at 583 n.3); *Stanko*, 402 S.C. at 264, 741 S.E.2d at 714 ("Jury instructions should be considered as a whole, and if as a whole, they are free from error, any isolated portions [that] may be misleading do not constitute reversible error.").

Moreover, in *Stanko*, our supreme court acknowledged, "[O]ften in murder cases there will be overwhelming evidence of malice, apart from the use of a deadly weapon." 402 S.C. at 264, 741 S.E.2d at 714. In evaluating the evidence of malice in the case before it, the court observed that the State presented uncontested evidence showing the appellant "shot the Victim, his elderly and unarmed friend, in the back using a pillow as a silencer," then robbed him, "and for the next several days used his automobile to travel across the state, where he engaged in social activities and drinking." *Id.* The court further observed, "Authorities apprehended [the a]ppellant in possession of the Victim's vehicle and the gun used in the murder. Thus, the evidence of malice in this case is not limited to [the a]ppellant's use of a deadly weapon." *Id.*

The court also examined the malice instruction in light of all of the jury instructions as a whole. *Id.* at 265, 741 S.E.2d at 714. The court stressed that in addition to instructing the jury that malice could be inferred from the use of a deadly weapon, the circuit court "also stated that malice 'can be inferred from conduct showing total disregard for human life'" and that the appellant challenged merely the "deadly weapon" language. *Id.* at 265, 741 S.E.2d at 715. The court concluded the jury could have found that the appellant's conduct showed a total disregard for human life and, therefore, the appellant could not have suffered prejudice from any separate inference that his use of a deadly weapon also gave rise to an inference of malice. *Id.* Based on its examination of the jury instructions as a whole and the evidence of malice aside from the use of a deadly weapon, the court held that the circuit court's *Belcher* violation did not constitute reversible error. *Id.*

In the present case, Appellant argues, "[I]t is conceivable that the evidence to support a finding of malice was the use of the weapon . . . ." However, Appellant does not argue it is conceivable that his use of the gun was the *only* evidence of malice. *Cf. Belcher*, 385 S.C. at 612, 685 S.E.2d at 810 ("It is entirely conceivable that the *only* evidence of malice was Belcher's use of a handgun. We need go no further than saying we cannot conclude the error was harmless beyond a reasonable doubt." (emphasis added)). Appellant also maintains that the State "cannot prove

the error was harmless beyond a reasonable doubt." Appellant argues that the erroneous instruction was given shortly after the circuit court instructed the jury to examine the surrounding circumstances to determine criminal intent and that the circumstances involved the use of a gun. Yet, Appellant does not explain why the State could not prove malice through the other circumstances of the case. *See Kerr*, 330 S.C. at 145, 498 S.E.2d at 218 ("The appellate court "must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict."). Here, as in *Stanko*, the circuit court included the following statement in its jury instructions on malice: "Malice also may be inferred from conduct showing a total disregard of human life." Appellant has not challenged this instruction. Further, as in *Stanko*, the jury could have found that Appellant's conduct showed a total disregard for human life.

In other words, aside from any inference of malice the jury may have drawn from Appellant's use of a deadly weapon, the evidence of Appellant's other conduct satisfied the definition of malice. *See In re Tracy B.*, 391 S.C. 51, 69, 704 S.E.2d 71, 80 (Ct. App. 2010) ("'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." (quoting *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998))); *id.* ("It is the doing of a wrongful act intentionally and *without just cause or excuse*." (emphasis added) (quoting *Tate v. State*, 351 S.C. 418, 426, 570 S.E.2d 522, 527 (2002))); *id.* ("Malice can be inferred from conduct [that] is so reckless and wanton as to indicate a depravity of mind and general *disregard for human life*. In the context of murder, malice does not require ill-will toward the individual injured, but rather it signifies "a general malignant recklessness of the lives and safety of others, or a condition of the mind [that] shows a heart regardless of social duty and fatally bent on mischief." (emphasis added) (citation omitted) (quoting *State v. Mouzon*, 231 S.C. 655, 662, 99 S.E.2d 672, 675–76 (1957))).

Appellant's conduct preceding, and immediately after, his choice to use a gun showed a "total disregard for human life."[4] After Fred and Brandon exited the Cockpit and went to Fred's car, Appellant and another man appeared behind Fred, displayed their guns, paced back and forth, and taunted Fred, who was locked out of his car. As soon as Fred saw that they were armed, Fred raised his hands to show he was unarmed, but Appellant was unaffected by this capitulation. Aside from his mere use of a deadly weapon, Appellant's reckless behavior began with a hail of gunfire, first in the direction of Brandon, then Fred, as he paced back and forth, and

---

[4] *Stanko*, 402 S.C. at 265, 741 S.E.2d at 715; *see In re Tracy B.*, 391 S.C. at 69, 704 S.E.2d at 80 (quoting *Mouzon*, 231 S.C. at 662, 99 S.E.2d at 675–76).

finally toward Fred's car as he paced backwards, approaching Rickena's parked car.[5]
Rickena testified that as Appellant approached her car, she saw he had a gun and
said, "[N]o, Dink, No, Dink."  Appellant responded, "Get down" while gesturing
with his arm for her to stay out of the way.  After Appellant stopped firing his gun,
he immediately ran to, and entered, a car that had pulled up behind Rickena's car and
fled the scene.

Additionally, Appellant's efforts to cover up his guilt indicate his malice.  *Cf.
State v. Ballington*, 346 S.C. 262, 273, 551 S.E.2d 280, 286 (Ct. App. 2001),
*overruled on other grounds by Belcher*, 385 S.C. at 612, 685 S.E.2d at 810
("[E]vidence Ballington attempted to cover up how his wife died suggests he killed
her with a wicked or depraved spirit.").  During her closing argument, the prosecutor
highlighted several of these efforts.  First, between 6:00 and 7:00 a.m. on the
morning of the shooting, Appellant made thirteen calls from his cell phone, all
originating from the area surrounding the Cockpit, and then changed his cell phone
number the next day.  Second, when Appellant gave a statement to police on
February 10, 2014, he lied about who picked him up at the Cockpit, stating that his
son's mother, Denique Banks, picked him up "around 2:30 to 3:00 a.m."  Denique
testified that when she informed police that she had picked up Appellant from the
Cockpit on the morning in question, she was lying.  She did not, in fact, pick him up
that morning.  Eric Brown, who was with Appellant inside the Cockpit before the
shooting, testified that Appellant got into Eric's car as Eric was leaving.

Third, Appellant lied about the time he left the Cockpit.  He told police that
Denique picked him up around 2:30 or 3:00 a.m., but Fred, Brandon and Andre did
not even arrive at the Cockpit until that time, and police did not arrive to investigate
the shooting until 6:00 a.m., around the same time Appellant was making calls from
his cell phone while still in the vicinity.  He also lied about his nickname, denying
that it was Dink.

Finally, Appellant cut his hair after the February 2 shooting and lied to police
about it.  When he gave a statement to police on February 10, he told police that he
had cut his hair two to three weeks prior to that day.  That would mean that Appellant
cut his hair before the shooting.  Yet, when Fred picked out Appellant from a photo
lineup on April 14, he noticed Appellant's hair was shorter in the photo than it was
at the time of the shooting.  Rickena noticed the same discrepancy when she picked
out Appellant from a photo lineup.  Appellant also told police that he cut his
dreadlocks for his job, he "wanted people to look at [him] differently," and he "was

---

[5] Ten shell casings were later collected at the scene.

tired of being judged." However, the assistant manager at his place of employment, Zaxby's, testified that dreadlocks were allowed and that it would not be Zaxby's policy to ask an employee to cut them; rather, employees with hair extending below the shoulders would have to tie their hair back. Appellant interviewed for the job at Zaxby's on February 5 and started working there on February 7, just a few days after the shooting. Denique testified that Appellant had worn dreadlocks at other restaurants where he had worked before working at Zaxby's.

Based on the foregoing evidence, the jury could have found that Appellant's conduct showed a total disregard for human life, allowing the jury to infer malice from this conduct after having been correctly instructed by the circuit court that they could do so. *See supra*. Accordingly, Appellant "could not have suffered prejudice from any separate inference that his use of a deadly weapon also gave rise to an inference of malice." *Stanko*, 402 S.C. at 265, 741 S.E.2d at 715. We acknowledge our supreme court's exposition of the prejudice resulting from a "court-sponsored emphasis of a fact in evidence." *Burdette*, 427 S.C. at 503, 832 S.E.2d at 582; *see id.* at 502–03, 832 S.E.2d at 582 ("Even telling the jury that it is to give evidence of the use of a deadly weapon only the weight the jury determines it should be given does not remove the taint of the trial court's injection of its commentary upon that evidence."). Nevertheless, the circuit court's "commentary" on the use of a deadly weapon in the present case could not have eclipsed the impact of Fred's powerful testimony that he raised his hands to show he was unarmed and this capitulation had no effect on Appellant. *See Yates*, 500 U.S. at 403 ("To say that an error did not contribute to the verdict is . . . to find that error unimportant *in relation to everything else the jury considered on the issue in question*, as revealed in the record." (emphasis added)); *Burdette*, 427 S.C. at 496, 832 S.E.2d at 578 ("When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" (quoting *Middleton*, 407 S.C. at 317, 755 S.E.2d at 435)).

We also note the jury submitted three questions to the circuit court, two of which concerned malice, and none of these questions concerned the inference of malice from the use of a deadly weapon. Rather, the jury's questions about malice concerned how to "consider . . . intoxication [with] respect to the state of mind" and whether the jury could consider intoxication if not presented with "explicit evidence" of it. The third question asked if the jury could "convict someone of possession of a deadly weapon without a weapon."[6] In response, the circuit court instructed the jury that voluntary intoxication is not a defense to a crime. The circuit court also

---

[6] Police did not recover a gun connected to the shooting.

instructed the jury that (1) the State accused Appellant of possession of a weapon while committing a violent crime, (2) the State had to prove the violent crime of murder or voluntary manslaughter, and (3) the testimony and evidence was what the jury could consider. The jury's questions and the circuit court's response suggested that the jury was not focused on, or affected by, the erroneous inferred malice instruction. *See Yates*, 500 U.S. at 403 ("To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.").

We conclude that, beyond a reasonable doubt, the challenged inferred malice instruction did not contribute to the verdict and, thus, did not constitute reversible error.

## II. Exclusion of Photographs

Appellant asserts the circuit court erred by excluding from evidence two photographs found on the cell phone of a bar patron present at the shooting and in communication with a suspect. He argues the photographs showed a gun of the same caliber as shell casings found at the scene and, thus, were relevant to his defense of third party guilt. He maintains that the photographs "would have assisted the jury in determining whether [he] was the person who shot Brandon or whether someone else was the triggerman." We conclude that the circuit court acted within its discretion in excluding the photographs from evidence. *See Dickerson*, 395 S.C. at 116, 716 S.E.2d at 903 ("The admission of evidence is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion.").

It is well-established that a criminal defendant's offer of evidence concerning a third party's commission of the charged crime "must be limited to such facts as are inconsistent with his own guilt[] and to such facts as raise a reasonable inference or presumption as to his own innocence." *State v. Gregory*, 198 S.C. 98, 104, 16 S.E.2d 532, 534 (1941) (quoting 16 C.J. 560) (cited with approval in *Holmes v. South Carolina*, 547 U.S. 319, 328 (2006)). "[E]vidence [that] can have [no] other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." *Id.* (third alteration in original) (quoting 16 C.J. 560).

> [B]efore such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends *clearly to point out such other person as the guilty party*. Remote acts, disconnected and

outside the crime itself, cannot be separately proved for such a purpose. An orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial does not contemplate that such defendant be permitted, by way of defense, to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that someone other than he is more probably guilty.

*Id.* at 104–05, 16 S.E.2d at 535 (emphasis added) (quoting 20 Am. Jur. 254).

"[T]he *Gregory* rule requires the trial judge to consider the probative value or the potential adverse effects of admitting proffered third-party guilt evidence." *State v. Swafford*, 375 S.C. 637, 641, 654 S.E.2d 297, 299 (Ct. App. 2007) (citing *Holmes*, 547 U.S. at 329). In *Holmes*, the United States Supreme Court characterized the *Gregory* rule's purpose as focusing "the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." 547 U.S. at 330. The *Holmes* court recognized that evidence of third-party guilt is appropriately managed by evidentiary rules such as Rule 403, SCRE. 547 U.S. at 327. Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)). The appellate court reviews the circuit court's Rule 403 ruling "pursuant to the abuse of discretion standard and [is] obligated to give great deference to the [circuit] court's judgment." *Id.*

Here, when defense counsel proffered the photographs at trial, she explained that the gun from the photographs was a .22 caliber gun that held nine .22 caliber "shell casings or bullets" and nine shell casings were collected from the scene after the shooting. However, the record indicates that ten, rather than nine, shell casings were collected at the scene. Counsel stated that the photographs were discovered the day after the shooting on the cell phone of Josie Paxton, who was inside the Cockpit at the time of the shooting. Counsel also stated that Josie gave a statement to police and they took her phone because Antonio "Bling" Williams, her ex-boyfriend, "texted her and called her and told her that [his] home dog just shot [his] other home dog." Yet, there is no evidence in the record substantiating the contents

of Bling's alleged text to Josie. Ultimately, the circuit court ruled that the photographs were inadmissible because they would be confusing to the jury. In light of the other evidence presented at trial, this ruling was correct.

Josie Paxton testified that she was inside the Cockpit when the shooting occurred. She spoke with the police later that morning and advised them that Bling had information about the shooting. However, she did not identify Bling as the shooter. Sergeant Cathy Etheredge, a deputy with the Lexington County Sheriff's Office, spoke to Josie in a parking lot near the Cockpit and took photographs of text messages on Josie's cell phone. Sergeant Etheredge stated that Josie was agitated with Bling, with whom she had just spoken by phone, and she was upset about the shooting. Sergeant Etheredge also stated that Bling "showed up at the club where [Josie] was," but she did not state when this occurred. Sergeant Etheredge later met with Bling as part of her investigation, but she did not provide any useful information about this interview during her testimony.

Appellant maintains that the probative value of the photographs was high because the police had not recovered a gun connected to the shooting and the photographs cast doubt on Appellant's guilt by showing "Bling was the shooter." Appellant also maintains that the jury would not have been confused or misled "into believing the photographs purported to be anything except what they were—evidence of a gun capable of shooting the same caliber of bullets as those shot at Brandon and of holding the same number of bullets as shell casings found at the scene." However, ten shell casings were found at the scene, and Appellant has asserted the gun in the photographs could hold only nine bullets. Further, there is no evidence placing Bling at the scene before or during the shooting. The only testimony placing Bling at the Cockpit was from Sergeant Etheredge, who stated that Bling "showed up at the club where [Josie] was" without any indication of when this occurred.

Moreover, Josie described Bling as tall with dreadlocks that extended below his shoulders and a tattoo of the letter "L" in the middle of his forehead. On the other hand, Fred, who interacted with the shooter, never mentioned seeing any tattoos on him. Rather, he described the shooter as approximately five feet, eight inches tall with shoulder-length dreadlocks, dark skin, and small eyes. Fred also described the shooter as short. Likewise, Sergeant Etheredge recounted Rickena's description of the shooter as small in stature with small eyes and dreadlocks. In contrast, Sergeant Etheredge described Bling as a "taller" black male with long dreadlocks and an "L" tattoo in the center of his forehead. Therefore, the evidence indicates that Bling did not match the description of the shooter.

Based on the foregoing, we conclude that Appellant has not presented the requisite "train of facts or circumstances" tending "clearly to point out [the] other person as the guilty party." *Gregory*, 198 S.C. at 105, 16 S.E.2d at 535. Therefore, there are no exceptional circumstances warranting a reversal of the circuit court's exclusion of the photographs from evidence. *See Collins*, 409 S.C. at 534, 763 S.E.2d at 28 ("A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances."). We conclude that the circuit court acted within its discretion in excluding the photographs from evidence. *See Dickerson*, 395 S.C. at 116, 716 S.E.2d at 903 ("The admission of evidence is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion."); *Pittman*, 373 S.C. at 570, 647 S.E.2d at 166–67 ("An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support.").

## CONCLUSION

Accordingly, we affirm Appellant's convictions.

**SHORT and THOMAS, JJ., concur.**