9745

## STATE v. QUICK.

### (93 S. E. 127.)

1. CRIMINAL LAW—RES GESTAE—STATEMENTS OF ACCUSED—DURATION OF TRANSACTION.—In a murder trial, where defendant claimed that deceased fired first shot and the State claimed deceased was unarmed, and it appeared that fatal shot was fired in a public highway after defendant had alighted from his buggy, that the shooting caused defendant's horse to run away, ·that defendant ran after it, and on his return several minutes later told bystanders that there were two holes in his trousers caused by a bullet fired by deceased, his statement was admissible as part of *res gestae*.

2. HOMICIDE — EVIDENCE — DYING DECLARATION. — In a murder trial, where it appears that after deceased was shot he was in a semiconscious condition from which he reacted somewhat, the subsequent dying declaration is not admissible until it is proven that declarant's condition causing disability had been removed.

Before SHIPP, J., Bennettsville, March, 1916. Reversed.

Lauder Quick was convicted of manslaughter, and appeals.

*Messrs. Townsend & Rogers,* for appellant, cite: *As to res gestae:* 68. S. C. 304; 86 S. C. 103; 67 S. C. 361; 119 U. S. 90; 19 L. R. A. 740, 742; 43 Ark. 99; 9 Am. Cr. Rep. 449; 5 A. & E. Enc. of L. 681. *Conduct of jury:* 14 S. C. 415; 33 S. C. 99. *Argument of Solicitor:* 26 S. C. 118; 77 S. C. 409.

*Mr. Solicitor Spears,* for respondent, cites: *As to res gestae:* 68 S. C. 276; 68 S. C. 304; 56 S. C. 369; 100 S. C. 388; 86 S. C. 98. *Conduct of jury:* 14 S. C. 415. *Argument to jury:* 91 S. C. 144; 88 S. C. 237; 2 R. C. L. 438.

July 7, 1917.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

The appellant, Lauder Quick, was indicted for murder. He was convicted of manslaughter, with a recommendation to mercy, and sentenced to six years on the chain gang.

The testimony, so far as it affects this appeal, is: The appellant and a friend named Staunton were riding along the public highway in a buggy, at night, when the deceased, Emerson Wright, and his brother, Manley Wright, also riding in a buggy, overtook them. The Wright brothers undertook to pass Quick and Staunton, when a quarrel arose between Quick and the Wrights. On the trial Manley Wright testified that, after some angry words passed between Quick, on the one side, and himself or his brother, on the other, Quick shot at him and his brother, and inflicted a fatal wound on his brother, but that neither he nor his brother had returned the fire, and that neither of the Wrights were armed. The appellant under-

took to show that he (Quick) was sitting in the buggy by the side of an automobile that was in trouble; that when he was moving his buggy out of the road to allow the Wrights to pass, the Wright buggy was driven too close, and the wheels of the two buggies became locked, and he got out of his buggy onto the ground to disengage the wheels, and while he was so engaged, the deceased shot at him, and he returned the fire; that he (Quick) was in charge of the buggy in which he had been sitting, but it was owned by Staunton; that while the shooting was going on, Staunton's horse ran off, and at Staunton's request he went after Staunton's horse and buggy and brought them back. Appellant undertook to prove by the occupants of the automobile, as a part of the *res gestae,* that as he came back with the horse and buggy, he told them that there were two holes in his trousers caused by a bullet fired by one of the Wrights. The testimony was ruled out on the ground that the search for the horse was an independent occurrence that intervened between the shooting and the declaration offered in evidence, and was not therefore a part of the *res gestae.* In passing on this testimony, his Honor said:

"But I can't hold—I can't see how I could hold the testimony that you propose to offer to be a part of the *res gestae,* for this reason, that it does not appear that it was a spontaneous expression growing out of the encounter, for the reason that it appears that several minutes had elapsed, some said three minutes, and some put it four or five minutes, but after the encounter the testimony of all of the witnesses was that Mr. Quick, that his horse got loose, and that he went off in pursuit of the horse, caught the horse, and then came back. His mind was on something entirely different."

What is or is not a part of the *res gestae* is largely a matter of discretion with the trial Judge. It is largely, but not entirely, a matter of discretion. The trial Judge must pass on these questions with but little time to consider

the surrounding circumstances and their relations to each other. In this case, Quick was left in charge of Staunton's horse. The testimony tends to show that the horse became frightened by the shooting and ran off in consequence of it. The capture of the horse by Quick, and its return to its owner, was a part of the transaction. The incident was not closed until the horse was returned. It took only a few minutes to capture and restore the horse, and immediately upon his return the declaration was said to have been made. The remark was said to have been made before the transaction closed, and was a part of the *res gestae.* This exception is sustained.

2. The next question is as to the admissibility of a dying declaration. It seems that the horse driven by the Wrights also ran off with them; that the deceased was put from the buggy into the piazza of a small house not far away from the place of the shooting. A doctor was summoned and testified:

"Q. Doctor, when you went to Emerson, did he say anything to you in regard to his condition, and what he expected to happen to him? The Court: I understood the doctor to say that he was in a semiconscious condition. The Witness: But he reacted from that before he was moved, somewhat. The Court: Go ahead. The Witness: He said he had been shot and was going to die; as soon as he reacted kinder. Q. What further did he say to you in regard to the shooting? A. Well, he said Lauder Quick shot him. Q. What else, the whole thing? A. He wanted to go home; he did not want to go to the hospital; he said that he was going to die, and that he would rather die at home. I told him that I preferred for him to go to the hospital, because we might possibly do something for him. Q. Anything else, doctor? A. Well, after getting to the hospital in the X-ray room, he wanted to know of me if he was going to die; he said he was sure he was, and I told him I hoped not; I could not say. Q. What did he say?

(Objected to.)   The Court: The question is whether he himself thought so.   The Witness: During the course of the conversation— Q. Not what he said in regard to the killing, but whether he was going to die or not? A. He said he had no hopes. Q. Now tell what else he said. Anything in regard to the killing? A. He said he did not have a gun.  I asked him, and told him what I found in his pocket, and he said to keep it. Q. That was in Hamlet? A. Yes, sir. Q. Did he go over in Hamlet the same thing he told you in the house there? A. Yes, sir. Q. Did he tell you again who shot him? A. Yes, sir; he said that his brother did not have a pistol, too; I asked him about that."

The doctor said the deceased reacted somewhat.   He did not say to what extent the deceased had reacted.   Before reaction took place the testimony was confessedly inadmissible, and it must appear that disability was removed before the testimony should have been received.   This exception is sustained.

3. The third exception is from the refusal of the trial Judge to grant a new trial, and appellant admits they are covered by exceptions 1 and 2.

4. Exceptions 4 and 5 refer to alleged errors peculiarly incident to the trial; and, as a new trial will be ordered, they need not be considered.

The judgment is reversed, and a new trial ordered.


Messrs. Justices Hydrick, Watts and Gage concur in the opinion of the Court.


Mr. Chief Justice Gary concurs in the result.