803 S.E.3d 911

The STATE, Respondent,

v.

Preston Ryan OATES, Appellant.

Appellate Case No. 2014-001404
Opinion No. 5502

Court of Appeals of South Carolina.

Heard June 7, 2017

Filed July 26, 2017

Rehearing Denied September 1, 2017

2

4

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mark Reynolds Farthing, both of Columbia; and Solicitor Isaac McDuffie Stone, III, of Bluffton, for Respondent.

GEATHERS, J.:

Appellant Preston Ryan Oates seeks review of his convictions for voluntary manslaughter and possession of a weapon during the commission of a violent crime. Appellant also challenges the denial of his motion for immunity from prosecution pursuant to the Protection of Persons and Property Act (the Act).[1] Appellant argues the circuit court erred in denying his motion for immunity because (1) there was evidence that the victim, Carlos Olivera (Victim), was attempting to forcibly remove Appellant from his occupied vehicle, and (2) the circuit court's finding that the conflict had resolved at the time of the shooting was not supported by the evidence.

Appellant also challenges the circuit court's refusal to direct a verdict of acquittal on the ground that the State failed to disprove self-defense. Finally, Appellant assigns error to the circuit court's decision to give a voluntary manslaughter instruction to the jury on the ground that there was no evidence of sudden heat of passion. We affirm.

## FACTS/PROCEDURAL HISTORY

On December 24, 2010, at approximately 8:00 p.m., Victim and his family visited his brother, Nelson Olivera (Nelson), and Nelson's family at their home in the Edgefield neighborhood near Bluffton. Although the Edgefield Homeowner's Association (the HOA) had prohibited parking on the streets in the subdivision, Victim parked his minivan on the street in

---

1. S.C. Code Ann. §§ 16-11-410 to -450 (2015).

front of the house of Nelson's neighbor, Steve Varedi. While Victim, Nelson, and their two families were visiting inside Nelson's house, Appellant, who had been hired by the HOA to tow illegally parked vehicles, noticed Victim's minivan and placed an automotive disabling device, i.e., a "boot," on the minivan's left front wheel. By the time Appellant was proceeding to hook up the minivan to the tow truck, Varedi had notified Victim that Appellant was about to tow Victim's minivan.

Victim, Nelson, and Varedi approached Appellant to ask him to refrain from towing the minivan because it was Christmas Eve and Victim was going to leave at that moment. When Appellant saw the three men approaching him, he felt intimidated and went back into the cab of his truck, shut the door, and locked it. Subsequently, Appellant rolled down the driver's side door window to speak with the men. According to Nelson, he was pleading for Appellant to release the minivan.

However, Appellant told investigators that when the three men approached him, they were running "a little abruptly" and were "hooting" and "hollering." He stated both Nelson and Victim jumped up on the truck's running board and started talking to him through the window and Victim told Varedi, "Go get my shotgun." Appellant recounted Nelson saying, "Take that off his vehicle," to which Appellant responded, "Okay[,] let me call my office and see what they [want to] do and we'll get a handle. . . . It's not a problem, we can work this out."

Appellant then heard "a round being chambered" as well as Victim stating, "You're [going to] take this off right now and I'm leaving," to which Appellant responded, "[T]hat's fine." Appellant further stated he stalled to regain his composure by fumbling with his set of keys and dropping them twice and he "kept kind of freaking out a little bit." Nelson's testimony was consistent with these two statements. Nelson admitted that Victim pulled a gun out of his pants, ratcheted the gun, and stated, "Nobody's going to take my car." Nelson stated Appellant "seemed very nervous, moving some keys and touching some papers," although he indicated this was already occurring when Victim pulled out his gun.

Appellant indicated that as he was fumbling with his keys, Nelson "grabbed" them along with the lock tool that releases the boot and took them to the front of the minivan.[2] According to Appellant, while Victim was still "in the window," he asked Appellant if he had any paperwork on the minivan and stated he did not want law enforcement to "come look" for him. This dialogue frightened Appellant; he recounted, "[T]hat threw up a major red flag because he wants to make sure there's nothing in my vehicle that will connect me to his car." Appellant then pulled out his ledger and showed it to Victim to reassure him that Appellant had no paperwork on the minivan. While he was showing Victim the ledger, Appellant opened his glove box and pulled out his gun along with some papers on top of it to hide it.

At this point, another neighbor, Reba Bryan, offered to call 911, but both Appellant and Nelson told her it was unnecessary. According to Appellant, he stated, "Don't worry about it, everything's fine, go back inside, he's got a gun, so everything's okay here" in an attempt to give her the message to call 911 without alerting the other men to his message. Appellant then heard Nelson yell out something in Spanish to Victim. At that moment, Victim "look[ed] at [Appellant] and he [stated], '[O]kay you're [going to] come get this s**t off.... Come get this s**t off now.'" Appellant described the next few moments in the following manner:

> [Victim] unlocked the door of my truck and pulled the handle and opened it, and as he opened it, he was stepping down off of the running board ... so he was opening it with his left hand.... As he stepped back, I saw him with his right hand reach and grab the pistol that was ... kind of stuffed in his belt in the front. Well, [with] my line of sight and where he was, I didn't [want to] just cross through the cab, so as he opened it, just to play along like I was [going to] exit the vehicle to unlock the boot, [because] he was already in draw, in motion.... And ... as he was stepping down[,] the door was open and he was starting to draw, I came around and I rotated and actually ... I [exited] the [cab] and as I was [exiting] the [cab], since I had a little bit of [a] height advantage on him, as I [exited] out straight

---

2. Appellant stated the set of keys had no relationship with the boot.

instead of toward him, I [exited] straight out my door stepping off of the metal running boards ... and I was [exiting] out, and I looked and my line of sight was through him straight down to the ground. It's now or never. He's already in motion and he's in draw. Whether he's drawing it to intimidate me, to keep me to go do what he wants me to do, or if he knew I didn't have any information on his vehicle and ... ah, bye, bye, Preston ... regardless, he was in motion, he was in draw and I reacted. I know ... I remember the very first shot. I caught him on the left side....

And that made him rotate left. Well, I didn't know if I grazed his ... the edge of his arm, if I grazed him under his ... I don't ... I didn't see [the] impact. I just know that I ... right when I was able to lock my elbows and squeeze the trigger ... I hit him on the left side. ... And so it may have caused him to rotate.... so he turned towards the yard .... And as he ... went that way, I remember seeing this part of his shoulder right here.... He was still a threat to me. You're a threat until you're disarmed or you're unconscious. I discharged again. I ... don't know how many times I pulled the trigger....

I remember two shots.... So as he's turning, ... that would be counter-clockwise, ... and his shoulder was here ... I ... let go a second round ... [because] my line of sight was clear, ... I still had a little bit of [a] height advantage because I was ... still progressing down from my elevated position.... And then when I stopped, I saw the gun slide across the asphalt and stop ... and I ... stopped and I landed on the ground at low ready and I froze there.

Several witness accounts of the entire incident conflicted with Appellant's statement that Victim ordered him out of the truck while he was drawing his pistol. According to Nelson, after Victim first ratcheted his gun and stated, "Nobody's going to take my car," Nelson told Victim to put his gun away, Victim then placed the gun back into his waistband, and Victim never pulled it back out. Nelson expressly stated there was "no arguing, ... no fighting, ... no bad words" and Victim never talked to, threatened, or "attempt[ed] to do anything to [Appellant]." Victim's widow, Dhayan Olivera, testified Victim was directing traffic that was partially blocked

by his minivan and the tow truck when Appellant shot him. Nelson's wife, Claudia Olivera, gave similar testimony. The testimony of Victim's widow, Nelson's wife, and Nelson's neighbors, as well as a video from Varedi's home surveillance camera, indicated Victim was walking or running away from Appellant when Appellant began shooting him. Nelson's wife and Victim's widow also testified Appellant continued shooting Victim even after he fell onto the street.

Several of the eyewitnesses, including Appellant, immediately called 911 to report the incident. The paramedic who later arrived on the scene detected no signs of life in Victim. Dr. Ellen Riemer, a forensic pathologist, conducted an autopsy on Victim and prepared a report revealing that Victim had been shot six times. In her report and at trial, she described the following gunshot wounds, not necessarily in the order in which Victim sustained them: (1) to the right side of the posterior neck; (2) to the right side of the abdomen; (3) to the middle of the back; (4) to the left side of the back; (5) to the posterior aspect of the right arm; and (6) to the left side of the upper back. Dr. Riemer confirmed there was only one gunshot wound that was not on the posterior aspect of Victim's body.

Dr. Riemer's report also noted she found no gunpowder residue near any of Victim's wounds. However, she testified that rather than characterizing the wounds as "distant gunshot wounds," she called them "indeterminate" because "even if it's at very close range, if there's an intermediate object that could absorb the stippling, ... it's not deposited on the skin" and she could not "say for certain, based on all the findings on the body, ... if it was shot at a distant range." Dr. Riemer also testified she examined Victim's clothing and saw "no obvious signs of any type of soot on the clothing."

Appellant was indicted for voluntary manslaughter and possession of a weapon during the commission of a violent crime. Appellant filed a motion for immunity under the Act, and the Honorable R. Markley Dennis, Jr. conducted a hearing on the motion, which he later denied. Appellant filed a motion for reconsideration, which Judge Dennis denied after a hearing. Appellant filed an appeal from these rulings; however, this court dismissed the appeal as interlocutory.[3]

---

3. Our supreme court has held that the denial of a motion for immunity from prosecution under the Act is not immediately appealable but may

Subsequently, Appellant was indicted for murder, and the solicitor dismissed the voluntary manslaughter indictment at the beginning of the murder trial before the Honorable Brooks P. Goldsmith. At the State's request and over Appellant's objection, the circuit court instructed the jury on the lesser-included offense of voluntary manslaughter. The jury found Appellant guilty of voluntary manslaughter and possession of a weapon during the commission of a violent crime. The circuit court sentenced Appellant to twenty-six years of imprisonment for voluntary manslaughter and five years of imprisonment for the weapon possession conviction, to run concurrently. The circuit court denied all of Appellant's post-trial motions, with the exception of his motion to reduce his sentence. The circuit court reduced the sentence for voluntary manslaughter to twenty-four years of imprisonment. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court abuse its discretion in declining to grant Appellant immunity from prosecution under the Act when there was evidence that Victim attempted to forcibly remove Appellant from his occupied vehicle?

2. Was the circuit court's finding that the conflict had resolved at the time of the shooting supported by the evidence?

3. Did the circuit court err in refusing to direct a verdict of acquittal on the basis of self-defense?

4. Was there evidence of sudden heat of passion to justify the circuit court's jury instruction on voluntary manslaughter?

## LAW/ANALYSIS

### I. Immunity

Appellant argues the circuit court committed an error of law in declining to find he was entitled to immunity under section 16-11-440(A) of the South Carolina Code (2015) because there

_____

be raised on appeal only after the subsequent prosecution, conviction, and sentencing. *See State v. Isaac*, 405 S.C. 177, 181–85, 747 S.E.2d 677, 679–81 (2013).

was evidence that Victim was attempting to forcibly remove Appellant from his occupied vehicle. Appellant also argues the circuit court abused its discretion in declining to find Appellant was entitled to immunity under section 16-11-440(C) because the circuit court's finding that the conflict had resolved at the time of the shooting was not supported by the evidence. We disagree.

"A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which this court reviews under an abuse of discretion standard of review." *State v. Jones*, 416 S.C. 283, 290, 786 S.E.2d 132, 136 (2016) (quoting *State v. Curry*, 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013)). "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Id.* "In other words, the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the [circuit] court's assessment of witness credibility." *State v. Douglas*, 411 S.C. 307, 316, 768 S.E.2d 232, 237–38 (Ct. App. 2014). Further, "the General Assembly did not intend" to require the circuit court "to accept the accused's version of the underlying facts" in determining a motion for immunity under the Act. *Curry*, 406 S.C. at 371, 752 S.E.2d at 266.

Section 16-11-440 provides, in pertinent part,

(A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:

(1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if he *removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle*; and

(2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.

. . .

(C) A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, *if he reasonably believes it is necessary to prevent death or great bodily injury to himself* or another person or to prevent the commission of a violent crime as defined in Section 16-1-60.

(emphases added).

Here, the circuit court reviewed (1) Appellant's December 24, 2010 videotaped interview with Sergeants John Adams and Laurel Albertin of the Beaufort County Sheriff's Office; (2) the audio recording of Appellant's December 27, 2010 interview with Captain Robert Bromage of the Beaufort County Sheriff's Office; (3) witness statements from Nelson, Nelson's wife, Victim's widow, and Nelson's neighbors (Varedi and Elizabeth Reyes Sorto); (4) a video from Varedi's home surveillance camera showing a portion of the incident;[4] (5) the autopsy report; (6) an audio recording of several 911 calls, including a call from Appellant; and (7) a Supplemental Incident Report authored by Angela Viens with the Sheriff's Office, which included summaries of on-the-scene statements given by Nelson, Varedi, and Reba Bryan. The circuit court also heard testimony from Investigator Viens and David Rice, a former concealed weapons permit instructor.[5]

After considering all of the evidence before it, the circuit court concluded section 16-11-440(A) did not apply to Appellant's case because "[t]he facts presented [did] not show that at the time of the shooting[, Victim] was unlawfully or forcibly entering, or had entered, [Appellant's] vehicle. [Victim] was walking away from [Appellant's] tow truck at the time [Appellant] got out of his vehicle and shot [Victim]." The circuit court also concluded section 16-11-440(C) did not apply to Appellant's case because "his use of deadly force against [Victim] was not necessary to prevent his own death or great bodily injury[ ] or the commission of a violent crime."

---

4. The quality of the video is poor.

5. In response to evidence that Victim had a concealed weapons permit, the defense offered the testimony of Rice regarding the instruction he gave his students on the permissible use of a concealed weapon.

Subsection (A)

■ Appellant argues the circuit court committed an error of law in failing to address the part of subsection (A) that allows the presumption of having "a reasonable fear of imminent peril or death or great bodily injury" when the person against whom deadly force is used "removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle." Appellant contends there was evidence that Victim was either attempting to remove, or had forcibly removed, Appellant from his truck at gunpoint.

However, the circuit court adequately addressed the language highlighted by Appellant. In its order denying Appellant's motion for immunity, the circuit court addressed the last phrase in subsection (A) in the "Facts" section of the order. In the order's recitation of the facts, the circuit court stated, "[Appellant] alleges that [Victim] was forcing him from the car at gunpoint. However, there are at least three other witnesses to the incident who state that the argument between the two men had subsided and that everyone present was calm at the time [Appellant] shot [Victim]." [6]

Admittedly, the circuit court did not address the last phrase in subsection (A) in its legal analysis. Nonetheless, because the circuit court addressed Victim's alleged attempt to force Appellant from his truck in the fact section of the order and implicitly found this version of the incident incredible, the failure to address this precise question in the order's legal analysis does not constitute reversible error. *See State v. Bryant*, 369 S.C. 511, 518, 633 S.E.2d 152, 156 (2006) ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result.").

---

6. In the hearing on Appellant's motion for reconsideration, the circuit court commented on its review of Appellant's two interviews with law enforcement, stating, "[T]here was much of his logic that ... I did not believe. I don't concur. I didn't agree with it. I didn't think that it was logical." The circuit court also stated, "In this particular case, I believed the version of facts testified [to] by the other witnesses, corroborated by scientific evidence of the gunshot wounds[, a]nd the witnesses' testimony of how it all happened, uh,—just simply it doesn't—it's more consistent with the other witnesses than it is his version."

16

Subsection (C)

 In its order denying immunity, the circuit court applied subsection (C) to the facts of the present case in the following manner:

The Act is specific that a person attacked in a place in which he has a right to be has no duty to retreat. The issue presented in this case, however, is whether this statute protects a person who shoots and kills another if the confrontation has ended and the victim is walking away. The Act allows a person to stand his ground and meet force with force if he *reasonably* believes it is necessary to prevent death or great bodily injury or to prevent the commission of a violent crime. In this case, while [Appellant] was in a place that he was allowed to be, his use of deadly force against [Victim] was not necessary to prevent his own death or great bodily injury[ ] or the commission of a violent crime. Assuming that there was an "attack" previously, there was no such event at the time of the shooting. In short, there was no force to be met. [Victim] was walking away from [Appellant] when he was shot five times in the back and once in the side. Other evidence presented supports the [c]ourt's finding that the argument had ended at the time [Appellant] fired the fatal shots. The [c]ourt will not interpret the language of the statute to mean that a person may shoot and kill another when a perceived attack has ended.

Appellant argues the record does not support the circuit court's conclusion that the attack had ended and, therefore, the circuit court abused its discretion in declining to find Appellant was entitled to immunity under subsection (C). Appellant asserts Victim intended to force Appellant to unlock the boot on Victim's minivan and Victim "had already made his intentions clear by either brandishing or pointing a firearm at Appellant." Appellant also asserts he reasonably believed deadly force was necessary to prevent death or great bodily injury.[7] Appellant states,

---

7. Appellant does not argue that deadly force was necessary to prevent the commission of a violent crime. *See* § 16-11-440(C) (granting a person "who is attacked in another place where he has a right to be" the right to "stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to ... prevent the commission of a violent crime as defined in Section 16-1-60").

This is not a situation where [Victim] had given up on trying to convince Appellant not to tow his minivan and was walking back to his brother's house to either call the police or prepare to pay the tow fine. [Victim] was determined to prevent his van from being towed and threatened Appellant with a gun.

While these arguments are compelling, this court cannot "reweigh the evidence or second-guess the [circuit] court's assessment of witness credibility." *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238. A review of the order denying immunity indicates the circuit court was not convinced of the reasonableness of Appellant's asserted belief that deadly force was necessary to prevent death or great bodily injury. *See id.* at 320 n.7, 768 S.E.2d at 239 n.7 ("[T]he standard for evaluating whether an accused had a reasonable belief that deadly force was necessary to prevent great bodily harm to himself is objective, rather than subjective."). Even if the uncontroverted facts show Victim was still intent on preventing his minivan from being towed when he had his back turned to Appellant, this is not necessarily inconsistent with the circuit court's perception that the aggression had abated at that precise moment. Such a finding supports the circuit court's conclusion that it was unreasonable for Appellant to believe deadly force was necessary at that particular point in time.

In sum, our deferential standard of review requires us to affirm the circuit court's denial of Appellant's motion for immunity from prosecution under the Act. *See Jones*, 416 S.C. at 290, 786 S.E.2d at 136 ("A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which this court reviews under an abuse of discretion standard of review." (quoting *Curry*, 406 S.C. at 370, 752 S.E.2d at 266)); *Curry*, 406 S.C. at 371, 752 S.E.2d at 266 (holding the General Assembly did not intend to require the circuit court "to accept the accused's version of the underlying facts" in determining a motion for immunity pursuant to the Act); *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238 ("[T]he abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the [circuit] court's assessment of witness credibility.").

## II. Directed Verdict/Self-Defense

Appellant maintains the circuit court erred in declining to direct a verdict of acquittal because the State failed to disprove self-defense. We disagree.

Directed Verdict/Self-Defense Standard

 "On appeal from the denial of a directed verdict, this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the State." *State v. Pearson*, 415 S.C. 463, 470, 783 S.E.2d 802, 806 (2016) (quoting *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014)). "If the [S]tate has presented 'any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused,' this [c]ourt must affirm the [circuit] court's decision to submit the case to the jury." *State v. Hepburn*, 406 S.C. 416, 429, 753 S.E.2d 402, 409 (2013) (quoting *State v. Cherry*, 361 S.C. 588, 593–94, 606 S.E.2d 475, 478 (2004)). "The case should be submitted to the jury if there is any substantial evidence [that] reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly or logically deduced." *State v. Robinson*, 310 S.C. 535, 538, 426 S.E.2d 317, 319 (1992). An appellate court may reverse the circuit court only if "there is no evidence to support" the circuit court's ruling. *State v. Gaster*, 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002).

 Recently, there has been confusion among the bench and bar regarding what standard the circuit court should apply to a directed verdict motion when self-defense has been asserted. *Butler*, 407 S.C. at 383–85, 755 S.E.2d at 461–62 (Beatty, J., concurring). In *State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011), our supreme court held that the defendant was entitled to a directed verdict on the ground of self-defense. The court began its discussion with the following language:

"A defendant is entitled to a directed verdict when the [S]tate fails to produce evidence of the offense charged." "If there is any direct or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the appellate court must find the case was properly submitted to the jury." However, when a defendant claims self-defense, the State is required to disprove the elements of self-

defense beyond a reasonable doubt. We find the State did not carry that burden.

*Id.* (citations omitted) (quoting *State v. Weston*, 367 S.C. 279, 292–93, 625 S.E.2d 641, 648 (2006)). Many have reasonably understood this language as requiring the State to disprove self-defense beyond a reasonable doubt at the directed verdict stage.[8]

 However, in *Butler*, the majority reaffirmed the principle that when ruling on a directed verdict motion, the circuit court "is concerned with the existence of evidence, not its weight." 407 S.C. at 381, 755 S.E.2d at 460 (quoting *State v. Wiggins*, 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998)); *see id.* (rejecting the defendant's argument that the circuit court should have required the State to disprove self-defense beyond a reasonable doubt at the directed verdict stage). The majority also expressed its disagreement with the defendant's reliance on *Dickey* "to support her contention that the [circuit] court applied an incorrect standard at the directed verdict stage." *Id.* The court responded that it held in *Dickey* "the defendant was entitled to a directed verdict on the issue of self-defense because the *uncontroverted* facts established self-defense *as a matter of law*." *Id.* (citing *Dickey*, 394 S.C. at 501, 716 S.E.2d at 102).

Based on the foregoing, we interpret *Butler* to stand for the proposition that our well-established directed verdict standard is not altered by a defendant's claim of self-defense.

Elements of Murder and Self-defense

 " 'Murder' is the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. § 16-3-10 (2015). " 'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." *In re Tracy B.*, 391 S.C. 51, 69, 704 S.E.2d 71, 80 (Ct.

---

8. Clearly, "[w]hen self-defense is properly *submitted to the jury*, the defendant is entitled to a *charge*, if requested, that the State has the burden of disproving self-defense by proof beyond a reasonable doubt." *State v. Burkhart*, 350 S.C. 252, 261, 565 S.E.2d 298, 303 (2002) (emphases added) (quoting *State v. Addison*, 343 S.C. 290, 294, 540 S.E.2d 449, 451 (2000)). The charge should also inform the jury that the State's burden "is carried by disproving any one of the four elements by proof beyond a reasonable doubt." *State v. Bixby*, 388 S.C. 528, 554, 698 S.E.2d 572, 586 (2010).

App. 2010) (quoting *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998)). "It is the doing of a wrongful act intentionally and *without just cause or excuse*." *Id.* (emphasis added) (quoting *Tate v. State*, 351 S.C. 418, 426, 570 S.E.2d 522, 527 (2002)).

> Malice can be inferred from conduct [that] is *so reckless and wanton as to indicate a depravity of mind and general disregard for human life*. In the context of murder, malice does not require ill-will toward the individual injured, but rather it signifies "a general malignant *recklessness of the lives and safety of others*, or a condition of the mind [that] shows a heart regardless of social duty and fatally bent on mischief."

*Id.* (emphases added) (citation omitted) (quoting *State v. Mouzon*, 231 S.C. 655, 662, 99 S.E.2d 672, 675–76 (1957)).

██ The elements of self-defense are:

> First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, *a reasonably prudent man of ordinary firmness and courage would have entertained the same belief.* If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant *had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did* in this particular instance.

*Douglas*, 411 S.C. at 318, 768 S.E.2d at 238–39 (emphases added) (quoting *Curry*, 406 S.C. at 371 n.4, 752 S.E.2d at 266 n.4).

Application

██ At trial, the jurors viewed Appellant's December 24, 2010 videotaped interview and the home surveillance video and listened to the recordings of (1) Appellant's December 27, 2010 interview; (2) his statements to Deputy Erick Hardy while

being transported to the Hilton Head substation of the Sheriff's Office; and (3) several 911 calls, including a call from Appellant. The jurors also heard testimony from Nelson, Nelson's wife, Victim's widow, Nelson's neighbors, Dr. Riemer, and those employees of the South Carolina Law Enforcement Division investigating the case.

Among these recordings and testimony was evidence from which the jury could have inferred not only a degree of recklessness that rises to the level of malice but also the unreasonableness of Appellant's stated belief that he was in imminent danger of losing his life or sustaining serious bodily injury. *See Douglas*, 411 S.C. at 318, 768 S.E.2d at 238–39 (setting forth the elements of self-defense); *In re Tracy B.*, 391 S.C. at 69, 704 S.E.2d at 80 ("Malice can be inferred from conduct [that] is so reckless and wanton as to indicate a depravity of mind and general disregard for human life."); *id.* ("[M]alice ... signifies 'a general malignant recklessness of the lives and safety of others, or a condition of the mind [that] shows a heart regardless of social duty and fatally bent on mischief.'" (quoting *Mouzon*, 231 S.C. at 662, 99 S.E.2d at 675–76)).

Several witness accounts of the entire incident omitted any reference to an extended heated argument. According to Nelson, when he and Victim first approached Appellant, Victim ratcheted his gun and stated, "Nobody's going to take my car," but when Nelson told Victim to put his gun away, Victim placed the gun back into his waistband and never pulled it back out. Nelson expressly stated there was "no arguing, ... no fighting, ... no bad words" and Victim never talked to, threatened, or "attempt[ed] to do anything to [Appellant]."

When asked if she heard any of the conversation between Victim and Appellant, Victim's widow replied, "No. [Victim] ... used to talk very soft[ly]." She also testified Victim was directing the traffic that was partially blocked by his minivan and the tow truck when Appellant shot him, and Nelson's wife gave similar testimony. The testimony of Nelson, Nelson's wife, Nelson's neighbors, Victim's widow, and Dr. Riemer established that most of the six shots fired by Appellant hit Victim in his back. Based on all of this testimony, the jury

could have concluded that Appellant's belief that his life was in danger was unreasonable.

Further, Dr. Riemer testified that an exit wound from Victim's chest was "shored," indicating that Victim was pressed against a hard object when the bullet exited his body. This is consistent with the testimony of Nelson's wife and Victim's widow that Appellant continued shooting Victim even after he fell onto the street. The jury could have concluded that Appellant's recklessness rose to the level of malice. Moreover, the jury could have inferred from the evidence that Appellant could have avoided the danger by continuing to cooperate with Victim and then driving away and calling 911 to report the incident.[9]

While there was enough evidence of self-defense to warrant a jury instruction, the evidence was conflicting. Given the starkly contrasting versions of events provided by the witnesses and by Appellant,[10] witness credibility was a critical factor in this case as it was in *Butler* and *State v. Richburg*, 250 S.C. 451, 459, 158 S.E.2d 769, 772 (1968). In *Richburg*, our supreme court held that the question of self-defense should be submitted to the jury when the credibility of the witnesses is in play:

> Appellant contends ... that the [circuit court] should have directed a verdict, as a matter of law, of not guilty in favor of the defendant on the plea of self-defense. When the evidence is susceptible of more than one reasonable inference, questions of fact must be submitted to the jury. We think jury issues were made by the whole of the evidence. Among other considerations is the credibility of the witnesses, including that of the appellant himself. When there is reason to discredit a witness because of interest or otherwise[,] the [circuit court] is not required to take the case from the jury as a matter of law but may and should

---

9. While a person seeking immunity from prosecution under section 16-11-440(C) may use deadly force to prevent the commission of a violent crime, there is no comparable language in our case law discussing the elements of self-defense. *See, e.g., Douglas*, 411 S.C. at 318, 768 S.E.2d at 238–39.

10. Although Appellant did not testify at trial, the jury viewed his recorded interviews with police.

submit the issues, including credibility of the witnesses, to the jury.

250 S.C. at 459, 158 S.E.2d at 772. The court added, "We do not think the [circuit court] would have been justified in telling the jury that reasonable men could not disagree as to the truthfulness of appellant's version of the killing." *Id.* at 459–60, 158 S.E.2d at 772. Likewise, in *Butler*, our supreme court noted that the defendant's credibility problems distinguished the nature of the evidence in her case from the uncontroverted nature of the evidence in *Dickey* and concluded the credibility issues had *"to be resolved by the jury."* 407 S.C. at 382, 755 S.E.2d at 460 (emphasis added).

Based on the foregoing, the circuit court properly declined to direct a verdict of acquittal. *Cf. Dickey*, 394 S.C. at 503, 716 S.E.2d at 103 (concluding "the *uncontroverted* facts establish[ed] as a matter of law that Petitioner had no other probable means of avoiding the danger other than to act as he did" (emphasis added)); *State v. Long*, 325 S.C. 59, 63, 480 S.E.2d 62, 63–64 (1997) ("While self-defense can be inferred even from the State's version of the evidence, the evidence of self-defense is not conclusive. Whether [the] appellant actually believed he was in imminent danger of losing his life or sustaining serious bodily injury and whether an ordinary person would have entertained the same belief were questions for the jury.").

## III. Jury Instruction

 Appellant argues the circuit court erred in charging the jury on the lesser-included offense of voluntary manslaughter because there was no evidence of the element of "sudden heat of passion," i.e., that Appellant was acting under an uncontrollable impulse to do violence and was incapable of cool reflection as a result of fear. Appellant maintains, "[b]ased on the facts of this case, Appellant either shot in self defense or he acted with malice." We disagree.

 "Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *State v. Starnes*, 388 S.C. 590, 596, 698 S.E.2d 604, 608 (2010). "To warrant the court eliminating the charge of manslaughter, there must be *no evidence whatsoever tend-*

*ing to reduce the crime from murder to manslaughter.* If there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." *Id.* (emphasis added) (citation omitted).

"Whether a voluntary manslaughter charge is warranted turns on the facts. If the facts disclose any basis for the charge, the charge *must* be given." *Id.* at 597, 698 S.E.2d at 608 (emphasis added).

> [F]ear resulting from an attack can constitute a basis for voluntary manslaughter. Yet the presence of fear does not end the inquiry regarding the propriety of a voluntary manslaughter instruction. We have consistently held that sudden heat of passion upon sufficient legal provocation is defined as an act or event that *"must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection,* and produce what, according to human experience, may be called an *uncontrollable impulse to do violence."* While the act or event "need not dethrone the reason entirely, or shut out knowledge and volition," it *must cause a person to lose control.*
>
> We reaffirm the principle that a person's fear immediately following an attack or threatening act may cause the person to act in a sudden heat of passion. However, the mere fact that a person is afraid is not sufficient, by itself, to entitle a defendant to a voluntary manslaughter charge. Consistent with our law on voluntary manslaughter, in order to constitute "sudden heat of passion upon sufficient legal provocation," the fear must be the result of sufficient legal provocation **and** cause the defendant to lose control and create an uncontrollable impulse to do violence. Succinctly stated, to warrant a voluntary manslaughter charge, *the defendant's fear must manifest itself in an uncontrollable impulse to do violence.*
>
> A person may act in a deliberate, controlled manner, notwithstanding the fact that he is afraid or in fear. Conversely, a person can be acting under an uncontrollable impulse to do violence and be incapable of cool reflection as a result

of fear. The latter situation constitutes sudden heat of passion, but the former does not.

*Id.* at 598–99, 698 S.E.2d at 609 (emphases added) (citations omitted) (quoting *State v. Pittman*, 373 S.C. 527, 572, 647 S.E.2d 144, 167 (2007)).

 "In determining whether the act [that] caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *State v. Smith*, 391 S.C. 408, 413, 706 S.E.2d 12, 15 (2011).

In *Cook v. State*, 415 S.C. 551, 555, 784 S.E.2d 665, 667 (2015), as in the present case, the defendant objected to the State's request for a voluntary manslaughter instruction. The circuit court had relied on the following facts in determining that a charge on voluntary manslaughter was supported by the evidence: (1) the defendant was in fear, (2) he shot the victim twice, and (3) he stated "before I knew it, I fired a shot." *Id.* at 557, 784 S.E.2d at 668. However, our supreme court held that the defendant's actions did not suggest he was acting in the sudden heat of passion. *Id.* at 559, 784 S.E.2d at 669. The court explained, "We do not believe the fact that Cook shot Victim twice or his statement 'before I knew it, I fired a shot' is evidence that Cook's fear manifested in an uncontrollable impulse to do violence." *Id.* at 558, 784 S.E.2d at 668. The court also stated,

> Here, Cook stated he tried to walk away from Victim, but Victim kept cutting him off. The fact that Cook was trying to walk away from the conflict does not suggest Cook was incapable of cooling off. In addition, Bridges testified that Cook and Victim were talking softly and that he could hardly tell they were arguing. This too does not suggest that Cook was acting under an uncontrollable impulse to do violence as surely if one was so enraged to kill, one would not be talking softly with the victim right before the act. Further, at no point during Cook's statement does he indicate he lacked control over his actions. Accordingly, we believe the facts of this case suggest Cook shot Victim either with malice or in self-defense.

*Id.* at 557, 784 S.E.2d at 668. The court also noted there was no physical altercation involved. *Id.* at 559, 784 S.E.2d at 669.

Likewise, our supreme court concluded there was no evidence of sudden heat of passion in *Starnes* and, therefore, upheld the circuit court's refusal to charge the jury on voluntary manslaughter. 388 S.C. at 599–600, 698 S.E.2d at 609. The defendant and the two victims, Bill and Jared, were engaged in a drug purchase with a fourth individual, Jody, at the defendant's home when Jared "pulled a gun on" Jody. *Id.* at 595, 698 S.E.2d at 607. The defendant testified Jared's action "scared" him, and he went into his bedroom to retrieve his gun. *Id.* at 595, 599, 698 S.E.2d at 607, 609. As the defendant exited his bedroom, "Bill said 'whoa' and was pointing a gun at him." *Id.* at 595, 698 S.E.2d at 607. The defendant then shot Bill and Jared. *Id.* On appeal, the court acknowledged the evidence of the defendant's fear but concluded there was no evidence that the defendant was "out of control as a result of his fear or was acting under an uncontrollable impulse to do violence." *Id.* at 599, 698 S.E.2d at 609. The court stated the evidence showed that the defendant "deliberately and intentionally shot Jared and Bill and that he either shot the men with malice aforethought or in self-defense." *Id.*

In the present case, however, the jury could have reasonably inferred from the evidence that when Appellant shot Victim six times, he was acting under "an uncontrollable impulse to do violence" even if the jury could have drawn an equally reasonable inference that Appellant acted in a "deliberate, controlled manner." *Id.* Admittedly, several witness accounts of the entire incident are comparable to witness accounts of the defendant and the victim "talking softly" in *Cook.* 415 S.C. at 557, 784 S.E.2d at 668. Further, Appellant told police that before he fired the fatal shots, he was in "conservation mode." When asked how many shots he fired, Appellant initially stated he remembered two shots and then compared his reaction during the incident to his reaction during a prior incident: "But I don't know when I ... I know ... I knew the first time on Hilton Head, I remember I emptied it ... Well, that ... that was a panic fire ... the first time. *This time, I had a little bit more composure.*" (emphasis added). Appellant also explained to police that the numerous shots fired at Victim were his attempt to disable Victim from

killing Appellant and that he kept shooting until he saw Victim's gun slide across the road beneath him. The jury could have reasonably inferred from all of this evidence that Appellant was acting in a "deliberate, controlled manner." *Starnes,* 388 S.C. at 599, 698 S.E.2d at 609.

However, unlike the lack of *any* evidence of sudden heat of passion in *Cook* and *Starnes,* there is some evidence in the present case from which the jury could have reasonably inferred that Appellant was "incapable of cool reflection" and was acting under an "uncontrollable impulse to do violence." *Starnes,* 388 S.C. at 598, 698 S.E.2d at 609 ("[S]udden heat of passion upon sufficient legal provocation is defined as an act or event that 'must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.'" (quoting *Pittman,* 373 S.C. at 572, 647 S.E.2d at 167)). First, neither *Cook* nor *Starnes* involved six gunshots to the same victim as does the present case. Further, one of Nelson's neighbors, Elizabeth Sorto, was sitting in her family's car in their driveway after returning from a restaurant when she heard "a lot of people outside yelling." She testified she saw "one of the guys" stepping onto the truck's "side rail" and "they were just getting very argumentative and just going back and forth." Her husband, Edwin Sorto, testified that as he was going into his house to obtain some personal belongings and returning to the car, he "could hear a dispute" and when he was back in the car, he heard gunshots fired in "rapid succession."

Moreover, Nelson testified Appellant was very nervous even before Victim ratcheted his gun. Appellant told Sergeants Adams and Albertin that after he heard Victim's gun ratchet, he tried to buy some time by fumbling with his set of keys and he "kept kind of *freaking out* a little bit." (emphasis added). He also stated that when Victim asked if Appellant had any paperwork documenting Victim's vehicle, "that's when I got *really scared.* That's when you get that little pain, like right below your sternum that kind of presses inward." (emphasis added). Appellant quoted Victim as stating that he did not want law enforcement "to come look for" him. Appellant understood this statement to mean that Victim wanted to make sure there was nothing in the tow truck that would

connect Appellant to Victim's vehicle. He continued, "Yeah, I've been in this business a long time[,] so now I'm *really nervous*. I knew I had my Glock in the glove box. His friend was on the way to retrieve a shotgun and I heard a pistol ratchet already...." (emphasis added).

Appellant also gave the following account of his reaction to Victim ordering him to exit his truck:

> I [exited] straight out my door stepping off of the metal running boards ... and I looked and my line of sight was through him straight down to the ground. *It's now or never.* He's already in motion and he's in draw. Whether he's drawing it to intimidate me, to keep me to go do what he wants me to do, or if he knew I didn't have any information on his vehicle and ... Ah, bye, bye, Preston ... regardless, he was in motion, he was in draw and *I reacted.*[11]

(emphases added).

The jury could have reasonably inferred from all of this evidence that when Appellant shot Victim six times, he was "incapable of cool reflection" and was acting under an "uncontrollable impulse to do violence" such that there was sufficient evidence of Appellant's sudden heat of passion. *See Starnes*, 388 S.C. at 598, 698 S.E.2d at 609 ("[S]udden heat of passion upon sufficient legal provocation is defined as an act or event that 'must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.'" (quoting *Pittman*, 373 S.C. at 572, 647 S.E.2d at 167)).

Finally, in addition to the above-referenced evidence, Appellant's behavior and words immediately after the shooting were relevant to his state of mind immediately before and during the shooting.[12] Nelson testified that immediately after shooting

---

11. In requesting the voluntary manslaughter charge, the assistant solicitor distinguished the present case from *Starnes* by noting Appellant's numerous descriptions of the emotions he felt during the incident and arguing that, collectively, all of these expressions showed heat of passion. The circuit court relied on this argument in granting the State's request.

12. *See State v. Martin*, 94 S.C. 92, 94, 77 S.E. 721, 721 (1913) ("The language and behavior of the defendant at the time of the shooting, or

Victim, Appellant was "waving [his pistol] around and saying, ['whoever comes] near me, I [will] kill you, don't move.[']" Nelson also testified that when he asked Appellant why he killed Victim, Appellant "was just saying bad words" and "put his gun ... on my forehead ... [a]nd he said, [']You make another step, I [will] kill you.[']" Nelson's neighbor, Steve Varedi, recounted that immediately after Appellant shot Victim, Appellant "was waving the firearm around just erratically at everyone, myself included." Claudia Olivera gave a similar account: "[Appellant] pointed the gun at me and at everyone, and he pointed the gun to my husband's head." She testified that when she tried to get near Victim's body, Appellant told her "[']don't move or I'll shoot.[']"

The jury could have reasonably inferred from all of this testimony that when Appellant shot Victim six times, he was incapable of cool reflection and was acting under an uncontrollable impulse to do violence. *See Starnes*, 388 S.C. at 598, 698

immediately afterwards, showing his attitude of aggression or of regret, clearly tended to enlighten the jury on the issue as to whether the shooting was done with malice, or in heat and passion, or in self-defense."); *see also Ramsey v. State*, 233 Ga. App. 810, 811, 505 S.E.2d 779, 781–82 (1998) (determining the admissibility of a defendant's after-the-fact admission to being under the influence of drugs at the time of the alleged battery and highlighting the defendant's claim of self-defense in holding, "the relevant inquiry is whether the evidence tends to show the accused's state of mind shortly before, during, or shortly after the commission of the crimes"); *cf. State v. Quick*, 107 S.C. 435, 438, 93 S.E. 127, 128 (1917) (holding the defendant's capture and return of a frightened horse to its owner at the scene of a gunfire exchange between the defendant and the victim was "part of the transaction," and the defendant's remark concerning being shot by the victim or his brother, which occurred "only a few minutes" after the shooting as he was returning the horse, "was a part of the res gestae"); *State v. McDaniel*, 68 S.C. 304, 310, 47 S.E. 384, 386 (1904) (stating that in order to be admissible into evidence, "declarations must be substantially contemporaneous with the litigated transaction, and be the instructive, spontaneous utterances of the mind *while under the active, immediate influences of the transaction*; the circumstances precluding the idea that the utterances are the result of reflection or design to make false or self-serving declarations" (emphasis added)); *id.* (holding that the circumstances of time and place surrounding the defendant's shooting of the victim "do not alone necessarily prevent a declaration from being part of the res gestae, but they are factors, with other circumstances, in determining whether the declarations were the *spontaneous utterances of the mind under the immediate influence of the transaction*" (emphasis added)).

S.E.2d at 609 (defining sudden heat of passion upon sufficient legal provocation).

Based on the foregoing, we affirm the circuit court's decision to give the jury a voluntary manslaughter instruction. *See id.* at 596, 698 S.E.2d at 608 ("To warrant the court eliminating the charge of manslaughter, there must be no evidence whatsoever tending to reduce the crime from murder to manslaughter. If there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." (citation omitted)).

## CONCLUSION

We affirm the denial of Appellant's motion for immunity from prosecution pursuant to the Protection of Persons and Property Act. We also affirm Appellant's convictions for voluntary manslaughter and possession of a weapon during the commission of a violent crime.

**AFFIRMED.**

MCDONALD and HILL, JJ., concur.